BaeNey, J.,
delivered the opinion of the court:
This is a claim'for the destruction of hay by the defendant Sioux Indians on the 20th day of August, 1875. The place of the depredation was a few miles from the Red Cloud Agency in Nebraska, located about 5 miles from Dakota on the north and the same distance from Wyoming on’the west. The claim was never presented to the Interior Department nor to Congress nor to any officer or agent of the Govern *179 ment. The court having decided that the depredation was committed upon Indian lands, thus depriving the court of jurisdiction, no finding as to the merits has been made.
It has been the uniform holding of this court that when at the time and place of the depredation the claimants were trespassers upon Indian lands there could be no recovery. (Welch v. The United States, 32 C. Cls., 106; Merchant v. The United States, 35 C. Cls., 403.) Cases have been decided in favor of claimants when they were upon roads or trails leading through Indian country at the time of the depredation based upon an implied license, but these decisions do not disturb the general rule as stated.
The act of June 30,1834 (4 Stat. L., 731, sec. 17), which is the foundation upon which subsequent legislation is based, giving this court jurisdiction in this class of cases, provides for recovery only when the property taken or destroyed was not in the “ Indian country ” or was lawfully in such country. The first definition of “ Indian country ” is found in section 1 of the same statute, and is as follows:
“ That all that part of the United States west of the Mississippi and not within the States of Missouri and Louisiana or the Territory of Arkansas, and also that part of the United States east of the Mississippi River and not within any State to which the Indian title has not been extinguished, for the purposes of this act, be taken and deemed to be Indian country.”
This definition was not carried forward to the Revised Statutes, but the Supreme Court has held that it may be referred to with a view of determining from time to time what must be regarded as “Indian country.” (Ex parte Crow Dog, 109 U. S., 556, 561.) In that case the court said:
“ Nevertheless, although the section of the act of 1834 containing the definition of that date [Indian country] has been repealed, it is not to be regarded as if it had never been adopted, but may be referred to in connection with the provisions of its original context which remain in force, and may be considered in connection with the changes which have taken place in our situation, with a view of determining-from time to time what must be regarded as Indian country where it is spoken of in the statutes.”
*180 And said further:
“ In our opinion that definition now applies to all the country to which the Indian title has not been extinguished within the limits of the United States, even when not within a reservation expressly set apart for the exclusive occupancy of Indians, although much of it has been acquired since the passage of the act of 1834, and notwithstanding the formal definition in that act has been dropped from the statutes, excluding, however, any territory embraced within the exterior geographical limits of a State, not excepted from its jurisdiction by treaty or by statute, at the time of its admission into the Union, but saving, even in respect to territory not thus excepted and actually in the exclusive occupancy of'Indians, the authority of Congress over it under the constitutional power to regulate commerce with the Indian tribes, and any treaty made in pursuance of it.” (Id., 561.)
It might, perhaps, well be said that the treaty of Fort Laramie was merely a recognition by the United States and by the other tribes who joined in the treaty of the aboriginal title to the lands in question, which the Sioux Indians had held from time immemorial, and that the Sioux Indians did not derive their title from this treaty, nor from any treaty, the principal object and effect of the treaty being to give xjositive limits to the claims of the various tribes who were parties to it. But without discussing that interesting question this case will be considered upon the assumption that the Sioux Indians derived their title from the treaty of 1851 (Kappler's Indian Treaties, Vol. II, p. 594), commonly known as the “ Fort Laramie treaty,” as modified -and recognized by subsequent treaties and legislation. Article 5 of this treaty is as follows:
“The aforesaid Indian nations do hereby recognize and acknowledge the following tracts of country, included within the metes and boundaries hereinafter designated, as their respective territories, viz:
“‘The territory of the Sioux or Dahcotah Nation, commencing at the mouth of the White Earth River, on the Missouri River; thence in a southwesterly direction to the forks of the Platte River; thence up the North Fork of the Platte River to a point known as the ‘Red Butte,’ or where the road leaves the river; thence along the range of mountains *181 known as the ‘ Black Hills ’ to the headwaters of Hart River; thence down Hart River to its mouth; and thence down the Missouri River to the place of beginning.”’
It might be said, by way of comment upon this provision, that it clearly recognizes the prior title of the Sioux Indians to the lands described, and is practically a cession by them of all lands not within the description. This reservation includes all of the northwest portion of the present State of Nebraska, and the depredation under consideration was well within it.
This treaty was negotiated with several tribes of Indians besides the Sioux. It was ratified by the Senate with an amendment changing the period during which the annuities therein provided for should be paid from fifty to ten years. The treaty was then sent back to procure the assent of the various tribes to the Senate amendment. The assent of the Sioux and of all of the tribes who were parties, except the Crows, was given. (Kappler's Laws and Treaties, Vol. II, p. 594, note.)' The treaty was never formally proclaimed by the President, but it was acted upon by the Congress by making appropriations to pay the annuities therein provided for from March 3, 1852, to March 3, 1865, which included an extension of five years made by the President. (10 Stat. L., 238; 13 ibid., 550.) This treaty was also referred to in 'a subsequent treaty with the same Indians. {Revision of Indian Treaties, 885, 886.) It is contended by the claimant that this treaty never was completed or “made” so as to be of binding force because of the fact, as stated, that it never was formally proclaimed by the President.
. In enumerating the powers of the President the Constitution provides: “ He shall have power, by and with the advice and consent of the Senate, to make treaties,” etc'. (Constitution, clause 2, sec. 2, Art. II.) It further provides: “All treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land.” (Constitution, clause 2, Art. VI.) No provision is made in the Constitution for a proclamation by the President to give validity to a treaty, and we know of no law of Congress making such provision. ' Treaties are made by the President “ by and with the advice and consent of the Senate ” (commonly *182 called ratification), and when made are the law the same as any statute enacted by the Congress. Our attention has not been called to any law requiring either treaties or acts of Congress to be published before taking effect/] Acts of parliament take effect from the time that they receive royal assent and by relation from the earliest moment of the day on which it is given (Tomlinson v. Bullock, 42 B. Div., 230); and this rule has been applied in this country unless otherwise provided in the act itself or by some other law (Arnold v. United States, 9 Cranch, 104; Matthews v. Crane, 7 Wheat., 164; Wellman’s case, 20 Vt., 653).) In the case of Haver v. Yaker (9 Wall., 32) the question as to the time when a treaty was binding on individual citizens was under consideration, and the court said:
“It is undoubtedly true, as a principle of international law, that, as respects the rights of either government under it, a treaty is considered as concluded and binding from the date of its signature. In this regard the exchange of ratifications has a retroactive effect, confirming the treaty from its date. But a different rule prevails where the treaty operates on individual rights. The principle of relation does not apply to rights of this character, which were vested before the treaty was ratified. In so far as it affects them, it is not considered as concluded until there is an exchange of ratifications, and this we understand to have been decided by this court, in Arredondo’s case reported in 6 Peters (p. 749). The reason of the rule is apparent. In this country a treaty is something more than a contract, for the Federal Constitution declares it to be the law of the land. If so, before it can become a law, the Senate, in whom rests the authority to ratify it, must agree to it. But the Senate are not required to adopt or reject it as a whole, but may modify or amend it, as was done with the treaty under ^consideration. As the individual citizen, on whose rightáká: property it operates, has no means of knowing anything of it while before the Senate, it would be wrong in principle to hold him bound by it, as the law of the land, until it was ratified and proclaimed.”
It should be noted, however, that the question for decision in that case was whether a treaty took effect so as to affect the title to real estate in the State of Kentucky at the time it was “ concluded and signed ” or at the time it was ratified and exchanged — that is to say, whether "it should be retroactive, so as to affect the inheritance of real estate vesting *183 between the time of the conclusion and signing of the treaty and its ratification and exchange. So that the question now under consideration was not in that case. It was held, however, that as respects the rights of the parties to the treaty •it is considered as binding from the date of its signature, and its subsequent ratification relates back to that date without reference to proclamation. Certainly, as to Indian treaties the contention that proclamation is necessary to give them binding force as between the parties is without reason. These Indians were our wards, and we thus occupied a fiduciary relation to them. The Sioux signed the treaty in the first instance, and when ratified and amended by the Senate they agreed to it as amended. They afterwards received annuities under it, and their rights to the lands described in it were repeatedly recognized, to which particular reference will hereafter be made. To now hold that that treaty never had any binding force on the United States or its citizens would be contrary to good faith and common honesty. This treaty was before this court in Moore v. The United States (32 C. Cls., 593), and it was there held that it was valid as to the Sioux Indians themselves. It would, indeed, be a harsh rule which would bind them to its provisions and release the United States and its citizens.
The right of the Sioux Indians to this territory was twice afterwards solemnly recognized by the United States, first in June, 1875, when an agreement was made with the Sioux Indians by which they ceded to the United States a tract of land in Nebraska extending westward from their eastern boundary, as defined by the treaty of Fort Laramie, and lying between the North Platte Eiver on the south and the southern divide of the Niobrara Eiver. This agreement, after reciting the consideration and the cession of the hunting privileges on the Eepublican Fork of the Big Smoky Hill Eiver and elsewhere, and all rights which the Indians retained in the unceded territory up to the limits above described, concludes with the following proviso:
“Provided, That we do not surrender any right of occupation of the country situated in Nebraska north of the divide, which is south of and .near to the Niobrara Eiver and west of the one hundredth meridian; but desire to retain *184 that country for future occupation and use.” (Report Secretary of the Interior, 1875, p. 179.)
The territory reserved in the above proviso is the territory involved in this case, as the place of the alleged depredation is more than 20 miles within its border.
Again in 1876 and 1877 the title of the Sioux to this country was recognized in the agreement which became effective upon its ratification by Congress in February, 1877. By this agreement the Sioux Indians finally ceded all their rights to territory outside of specific reservations set apart for them, and which cession included all of their lands in the State of Nebraska.
The Fort Laramie treaty was in effect in 1867 when Nebraska was admitted into the Union. Its effect was to reserve to the Indians their aboriginal title to the lands therein described and to make that portion of the State “ Indian country ” within the definition of that term in Ex parte Grow Dog supra.
By a treaty with the Sioux Indians in 1868, shortly after the admission of Nebraska and some time before the depredation in this case, they were given a reservation in Dakota, but it was expressly provided by section 16 of the treaty that the country north of the Platte River and east of the summits of the Big Horn Mountains should be held and considered to be unceded Indian territory; and the United States also agreed therein that no white person should be permitted to settle upon or occupy any portion of the same or to pass through it without the consent of the Indians. (15 Stat. L., 635, art. 16.) This article must be read in connection with the provisions of the Fort Laramie treaty in order to ascertain the eastern limit of the Sioux countiy so reserved, and shows the depredation alleged in this case to have been well within it.
As already stated, in 1877 and after the date of this depredation, the United States entered into an agreement with the Sioux Indians by the terms of which they relinquished their claim to the territory in question.
It follows from the foregoing that the depredation was committed in the Indian country and upon a reservation of the defendant Sioux Indians, and hence the petition is dismissed.