Madeline **COLLIFLOWER**, Appellant,

v.

John **GARLAND**, Sheriff of County of Blaine, Appellee.

No. 19170.

United States Court of Appeals Ninth Circuit.

Feb. 4, 1965.

Francis Conklin, Spokane, Wash., Melvin L. Wulf, New York City, for appellant.

J. Chan Ettien, Havre, Mont., for appellee.

Ramsey Clark, Asst. Atty. Gen., Roger P. Marquis, Dept. of Justice, Washington, D. C., for the United States as amicus curiae.

Before MERRILL, DUNIWAY and ELY, Circuit Judges.

DUNIWAY, Circuit Judge:

Madeline Colliflower sought a writ of habeas corpus in the district court. That court concluded that it was "without jurisdiction to issue a writ of habeas corpus." It therefore granted a motion to quash the writ and denied the petition for the writ. This appeal followed.

Madeline Colliflower is an Indian, a member of the Gros Ventre Indian tribe, which is a part of the Fort Belknap Indian community, located on the Fort Belknap reservation in Blaine County, Montana. In the return to the writ the following appears. Under date of June 20, 1963 Joe Plumage, Chief Policeman, filed a criminal complaint in the "Court of Indian Offenses, Ft. Belknap Jurisdiction, United States Indian Service," under the title "Fort Belknap Indian Community v. Madeline Colliflower" in which he charged Mrs. Colliflower with "disobedience to lawful orders of the Court in violation of sec. 36, Chapter 5, Law and Order Code of the Fort Belknap Indian Community," in that on June 13, 1963, within the Fort Belknap Indian Reservation, she "did disobey a lawful order of the Court by failing to remove her cattle from land leased by another person, after being ordered to do so by the Court, and against the peace and dignity of the Fort Belknap Indian Community." On the same day,

Cranston Hawley, Judge of the Court, issued a warrant directed "to any Police or Police Officer of the United States Indian Service," reciting the filing of the complaint, and ordering the arrest of Mrs. Colliflower, and that she be brought before a judge of the court to show why she should not be held for trial.

There is also a transcript of the proceedings of the "Law and Order Court" on June 25, 1963. The court was presided over by the Chief Judge Cranston Hawley, and there were present the Chief of Police, Joe Plumage, an "Area Special Officer," Mr. Willett, an "Agency Special Officer," Mr. Reddog, an "Agency Special Officer, Crow Agency," Mr. Joe Gray, and the defendant. The judge read the complaint to the defendant, and, following some discussion as to who was the lessee of the land in question, the judge stated: "I put out another order just after that to have your cattle removed, which was done, and the cattle were put back in the unit the same evening. Isn't that correct?" To this, Mrs. Colliflower replied: "Yes." The judge then inquired as to her plea and she pled not guilty. He then found her guilty and sentenced her to a fine of $25 or five days in jail. Mrs. Colliflower, following a further colloquy, elected to take the jail sentence because she could not pay the fine.

In her petition, Mrs. Colliflower alleged that pursuant to the judgment of the court, she was committed to the custody of the sheriff of Blaine County, who is the appellee. She claimed in the district court, and she claims in this court, that her confinement is illegal and in violation of her constitutional rights, because she was not afforded the right to counsel, was not afforded any trial, was not confronted by any witnesses against her, and because the action of the court was taken summarily and arbitrarily, and without just cause. Her reliance is upon the due process clauses of Amendment Article 5 of the Constitution of the United States, and of the Fourteenth Amendment to the Consti-

tution. The district court did not pass upon the merits of these questions because it decided that it did not have jurisdiction to issue a writ of habeas corpus for the purpose of determining the legality of the detention of an Indian who was committed by a tribal court, and it is the correctness of that decision that presents the sole question that is before us.

The solution of this question requires the recitation of some history. On September 17, 1851 a treaty was signed by the Blackfoot and Gros Ventre Indians and other tribes and the United States. It has been said that this treaty, which is known as the treaty of Fort Laramie, was not fully ratified. (See 11 Stat. 749) The text of the treaty appears in S.Doc. 53, 70th Cong., 1st Sess., p. 1065. The treaty was actually ratified on May 24, 1852, S.Doc. 53, 70th Cong., 1st Sess., p. 1065, and the Court of Claims, in two cases, Moore v. United States, 1897, 32 Ct.Cl. 593 and Roy v. United States, 1910, 45 Ct.Cl. 177, has held that the treaty is binding on the United States. See also Cohen, Handbook of Federal Indian Law, 1942, p. 62, where Mr. Cohen states that this is the first treaty between the Gros Ventres and the United States. The treaty deals largely with the territories of the tribes and an annuity to be paid to the Indians. It contains no reference to self-government by the Indians or to tribal courts.

On October 17, 1855, a second treaty was made with the Blackfoot nation, composed of Piegans, Bloods, Blackfeet and Gros Ventres. To this treaty the Flatheads and the Nez Perces were also parties. (See 11 Stat. 657) This treaty again is primarily concerned with the definition of boundaries, the prevention of disputes among the tribes, and the establishment of peace. There is no specific reference in the treaty to Indian self-government, although Article 11 contains certain provisions designed to secure the peace. It can fairly be said, however, that the treaty, like the many other Indian treaties made by the United States, is a recognition of the Blackfoot

nation as a nation. There is at least one other treaty, not ratified. (S.Doc. vol. 27, 62d Cong., 2d Sess. (1913), p. 705)

Congress put a stop to the making of treaties with Indians by the Act of March 3, 1871, 16 Stat. 566 (25 U.S.C. § 71). This enactment, however, contains a proviso that it is not to be construed to invalidate or impair the obligation of any treaty theretofore lawfully made and ratified with any Indian tribe or nation. Thus it would appear that these treaties are still in effect.

By an executive order of July 5, 1873, a Blackfoot Indian reservation, very large in size, was established in what is now the State of Montana. On April 15, 1874 Congress established a reservation for the various Blackfoot tribes (18 Stat. 28). This was a smaller territory than that established by the executive order. There were subsequent executive orders modifying the boundaries of the reservation, on August 19, 1874, April 13, 1875 and July 13, 1880. By Act of May 1, 1888 (25 Stat. 113) Congress ratified an agreement with the Indians whereby the Blackfoot reservation was divided into three parts, one of which is the Fort Belknap Reservation. A description of this reservation appears in Fletcher, Indian Education and Civilization, 1888, S. Exec. Doc. 95, 48th Cong., 2d Sess., at p. 453.

The first reference to tribal courts such as that at Fort Belknap which has been brought to our attention is contained in the annual report of Commissioner of Indian Affairs to the Secretary of the Interior, 1885:

"Under date of April 10, 1883, the then Secretary of the Interior gave his official approval to certain rules prepared in this office for the establishment of a court of Indian offenses at each of the Indian agencies, except the agency for the five civilized tribes in the Indian Territory. It was found that the longer continuance of certain old heathen and barbarous customs, such as the sun-dance, scalp-dance, polygamy, etc. were operating as a serious hindrance to the efforts of the Government for the civilization of the Indians. * * *

"There is no special law authorizing the establishment of such a court, but authority is exercised under the general provisions of law giving this Department supervision of the Indians. The policy of the government for many years past has been to destroy the tribal relations as fast as possible and to use every endeavor to bring the Indians under the influence of law." (P. xxi)

Congress took cognizance of these courts in 1888, in an Appropriation Act, 25 Stat. 217. This act, in addition to appropriations of $1,000 for the pay of an Indian Agent at Ft. Belknap (pp. 217–218) and of sums for "subsistence and civilization" of the Gros Ventres (p. 230), appropriates money for the employment of Indian police and for compensation of judges of Indian courts (p. 233). In the Commissioner's Annual Report for 1889, the following statement appears:

"Prior to the last fiscal year there was no fund for maintaining these courts, nor any law recognizing their existence, although this office had made repeated and urgent recommendations that provision be made for the pay of judges of the courts * * * the Appropriation Act of June 29, 1888, contains the following item: 'For compensation of judges of Indian Courts, at such rate as may be fixed from time to time by the Secretary of the Interior, five thousand dollars, or so much thereof as may be necessary.'

"Under this legislation it is practicable to make important changes and improvements in the organizations of the courts of Indian offenses and the methods adopted therein. * * * *"

The 1889 report also states:

"Since 1882, what is known as a 'court of Indian offenses' has been

established and maintained upon a number of Indian reservations. It has been a tentative and somewhat crude attempt to break up superstitious practices, brutalizing dances, plural marriages and kindred evils, and to provide an Indian tribunal which, under the guidance of the agent, could take cognizance of crimes, misdemeanors and disputes among Indians, and by which they could be taught to respect law and obtain some rudimentary knowledge of legal processes. Notwithstanding their imperfections and primitive character these so-called Courts have been a great benefit to the Indians and of material assistance to the agents."

There appears to be no mention of the creation of a tribal court at Fort Belknap earlier than 1899. (See Annual Reports of the Department of the Interior, 1900—Indian Affairs—Report of Commissioners, p. 270).

A contemporary judicial view of these tribal courts appears in United States v. Clapox, D.Ore., 1888, 35 F. 575, at 577, as follows:

"These 'courts of Indian offenses' are not the constitutional courts provided for in section 1, art. 3, Const., which congress only has the power to 'ordain and establish,' but mere educational and disciplinary instrumentalities, by which the government of the United States is endeavoring to improve and elevate the condition of these dependent tribes to whom it sustains the relation of guardian. In fact, the reservation itself is in the nature of a school, and the Indians are gathered there, under the charge of an agent, for the purpose of acquiring the habits, ideas, and aspirations which distinguish the civilized from the uncivilized man."

In 1934 the congress passed the Wheeler-Howard Indian Reorganization Act, (48 Stat. 984, 25 U.S.C. § 476). This statute permits an Indian tribe to organize for its common welfare and adopt an appropriate constitution and by-laws which are to become effective when ratified by the members of the tribe and approved by the Secretary of the Interior. The statute further provides:

"In addition to all powers vested in any Indian tribe or tribal council by existing law, the constitution adopted by said tribe shall also vest in such tribe or its tribal council the following rights and powers: To employ legal counsel, the choice of counsel and fixing of fees to be subject to the approval of the Secretary of the Interior; to prevent the sale, disposition, lease, or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe; and to negotiate with the Federal, State, and local Governments."

According to House Report No. 2503, 82nd Cong., 2d Sess., 1953, Table I, page 48, the Gros Ventres are governed by an administrative body and an administrative board subcommittee organized under the foregoing Act. Their constitution and by-laws were approved by the Secretary of the Interior on December 13, 1935, and the Charter became effective on August 25, 1937. Table XII, page 105, of the foregoing report shows that there is a tribal court and a court of Indian offenses. The latter we take to be the "Law and Order Court" that is here involved, or its predecessor.

While there is apparently still no Act of Congress providing for the establishment of tribal courts, the congress, as well as the executive, has assumed considerable responsibility for these courts. Thus, the Bureau of Indian Affairs is now authorized to direct, supervise, and expend such moneys as Congress may from time to time appropriate for the benefit, care and assistance of the Indians for various purposes, including the employment of Indian police and Indian judges (25 U.S.C. § 13). 25 U.S.C. § 200 requires that whenever an Indian is incarcerated, a report or record of the offense is to be immediately submitted to the superintendent of the reser-

vation and made a part of the records of the agency office. Mrs. Colliflower's confinement in the Blaine County jail is pursuant to a written contract entered into on June 6, 1957 between the United States, through the area director for the Bureau of Indian Affairs, and the County. By this contract the United States agrees to pay $2.75 per day for each prisoner.

Moreover, we are told by tribal counsel, who represents the appellee sheriff in this proceeding, that the Code of Indian tribal offenses which has been adopted by the Fort Belknap Indian community is taken almost verbatim from the regulations of the Bureau of Indian Affairs which are now codified in Title 25, Chapter 21, subchapter B of the Code of Federal Regulations revised as of January 1, 1958, beginning at section 11.1. These regulations appear to have been first promulgated in substantially their present form on November 27, 1935 (see 25 CFR, 1939 ed., § 161.1 ff). They establish or define a complete judicial system, and a code of offenses, and are prefaced as follows:

"The regulations in this part relative to Courts of Indian Offenses shall apply to all Indian reservations on which such courts are maintained.

"It is the purpose of the regulations in this part to provide adequate machinery of law enforcement for those Indian tribes in which traditional agencies for the enforcement of tribal law and custom have broken down and for which no adequate substitute has been provided under Federal or State law.

"No court of Indian Offenses will be established on reservations where justice is effectively administered under State laws and by State law enforcement agencies.

"The regulations in this part shall continue to apply to tribes organized under the Act of June 18, 1934 (48 Stat. 984; 25 U.S.C. 461–479) until a Law and Order code has been adopted by the tribe in accordance with its constitution and bylaws and has become effective."

Among other things, they provide that judges are appointed by the Commissioner of Indian Affairs, subject to confirmation by two-thirds vote of the Tribal Council (§ 161.3, now § 11.3), for removal of a judge by the Commissioner, for cause upon recommendation of the Tribal Council (§ 161.4, now § 11.4), for Rules of Court approved by the Tribal Council and by the Superintendent of the reservation (§ 161.5, now § 11.5(b)), and for participation in their affairs, in various ways, by the Superintendent. We are not told when the Fort Belknap Indian community adopted its own law and order code, but we are told, in appellee's brief, that "with only a couple of differences not material here, the Belknap Law and Order Code was taken bodily from 25 CFR 11."

The status of Indian tribes as separate nations or entities having some degree of sovereignty has long been recognized by the Supreme Court. The leading decision is the famous opinion of Chief Justice Marshall in Worcester v. State of Georgia, 1832, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483. That case upheld, against the pretensions of the State of Georgia, the treaty rights of the Cherokee nation. In so doing, Chief Justice Marshall said:

"The Indian nations had always been considered as distinct, independent, political communities, retaining their original natural rights, as the undisputed possessors of the soil, from time immemorial. * * *

"The Cherokee nation, then, is a distinct community, occupying its own territory, with boundaries accurately described, in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in conformity with treaties, and with the acts of congress. The whole intercourse between the United States and this nation, is, by our constitution and laws, vested in the

government of the United States. The act of the State of Georgia, under which the plaintiff in error was prosecuted, is, consequently void, and the judgment a nullity."

We know that in the more than one hundred and thirty years that have since passed, the "independence" of the Indian tribes and their resemblance to nations, have decreased, and their dependency has increased. As the United States has expanded, it has repeatedly broken its treaties, has taken the Indians' land by force, has repeatedly imposed new and more restrictive treaties upon them, has confined them in ever smaller reservations, often far from their original homes, and has reduced them to the status of dependent wards of the government.

The status of the Indian tribes at the time of the creation of the Fort Belknap tribal court is well described in United States v. Kagama, 1886, 118 U.S. 375, 381–385, 6 S.Ct. 1109, 1113–1114, 30 L. Ed. 228, in which the Court upheld the "Seven Major Crimes" Act (23 Stat. Chap. 341, Sec. 9, p. 385). There the Court said:

> " * * * They [the Indian tribes] were, and always have been regarded as having a semi-independent position when they preserved their tribal relations; not as states, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the state within whose limits they resided.
>
> * * * "These Indian tribes *are* the wards of the nation. They are communities *dependent* on the United States,—dependent largely for their daily food; dependent for their political rights. They owe no allegiance to the states, and receive from them no protection. Because of the local ill feeling, the people of the states where they are found are often their deadliest enemies. From their very weakness and helplessness, so largely due to the course of dealing of the federal government with them, and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the executive, and by congress, and by this court, whenever the question has arisen." * *
>
> "The power of the general government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it never has existed anywhere else; because the theatre of its exercise is within the geographical limits of the United States; because it has never been denied; and because it alone can enforce its laws on all the tribes."

It was long held that reservation Indians are not citizens. Elk v. Wilkins, 1884, 112 U.S. 94, 5 S.Ct. 41, 28 L.Ed. 643. However, in 1924, the Congress amended the Nationality Act to provide that a person born in the United States to a member of an Indian tribe shall be a national and citizen of the United States at birth. (See 8 U.S.C. § 1401 (a) (2)).

In more recent times it has been the policy of the government to encourage the Indians to become independent participating citizens, while at the same time preserving the territories and the rights of those tribes which elect to continue to function as such. The recent history and present policy are stated in the opinion of Mr. Justice Frankfurter in Organized Village of Kake v. Egan, 1962, 369 U.S. 60, at 72 ff, 82 S.Ct. 562, at 569, 7 L.Ed.2d 573, as follows:

> "As the United States spread westward, it became evident that there was no place where the Indians could be forever isolated. In recognition of this fact the United States began to consider the Indians

less as foreign nations and more as a part of our country. * * *"

"The general notion drawn from Chief Justice Marshall's opinion in Worcester v. State of Georgia, 6 Pet. 515, 561, 8 L.Ed. 483; The Kansas Indians, 5 Wall. 737, 755–757, 18 L.Ed. 667; and The New York Indians, 5 Wall. 761, 18 L.Ed. 708, that an Indian reservation is a distinct nation within whose boundaries state law cannot penetrate, has yielded to closer analysis when confronted, in the course of subsequent developments, with diverse concrete situations. By 1880 the Court no longer viewed reservations as distinct nations. On the contrary, it was said that a reservation was in many cases a part of the surrounding State or Territory, and subject to its jurisdiction except as forbidden by federal law. Utah & Northern R. Co. v. Fisher, 116 U.S. 28, 31, 6 S.Ct. 246, 247, 29 L. Ed. 542. * * *"

"The policy of assimilation was reversed abruptly in 1934. A great many allottees of reservation lands had sold them and disposed of the proceeds. Further allotments were prohibited in order to safeguard remaining Indian properties. The Secretary of the Interior was authorized to create new reservations and to add lands to existing ones. Tribes were permitted to become chartered federal corporations with powers to manage their affairs, and to organize and adopt constitutions for their own self-government. 48 Stat. 984, 986, 987, 988. * * *

"Concurrently the influence of state law increased rather than decreased. * * *"

The basic position of appellee, which was accepted by the trial court, is that the Indian tribal courts, to the extent that they still have jurisdiction of Indian offenses, are not courts of the states or of the nation, but of separate sovereignties, to which the Constitution does not apply, and over which the federal courts have no jurisdiction.

These tribal courts do still have a very considerable jurisdiction, and such jurisdiction is still, to a considerable extent, exclusive. This is the normal rule as to criminal offenses (18 U.S.C. § 1152; Ex parte Crow Dog, 1883, 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030; United States v. Quiver, 1916, 241 U.S. 602, 36 S.Ct. 699, 60 L.Ed. 1196; Iron Crow v. Oglala Sioux Tribe of Pine Ridge Res., 8 Cir., 1956, 231 F.2d 89) and as to suits against Indians arising out of matters occurring on the reservation (Williams v. Lee, 1958, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251; Prairie Band of Pottawatomie Tribe of Indians v. Puckkee, 10 Cir., 1963, 321 F.2d 767; Native American Church v. Navajo Tribal Council, 10 Cir., 1959, 272 F.2d 131.) The notion of sovereignty still bars the way of one who wishes to sue an Indian tribe. (United States v. United States Fidelity and Guaranty Co., 1940, 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894; Dicke v. Cheyenne-Arapaho Tribes, Inc., 10 Cir., 1962, 304 F.2d 113; Adams v. Murphy, 8 Cir., 1908, 165 F. 304; Thebo v. Choctaw Tribe, 8 Cir., 1895, 66 F. 372.) There is, however, a strong trend toward applying general congressional legislation to Indians. (F. P. C. v. Tuscarora Indian Nation, 1960, 362 U.S. 99, 116–117, 80 S.Ct. 543, 4 L.Ed.2d 584)

It is also true that an Indian tribe has the power, absent some treaty provision or act of congress to the contrary, to enact its own laws for the government of its people, and to establish courts to enforce them. (Iron Crow v. Oglala Sioux Tribe of Pine Ridge Res., supra; Williams v. Lee, supra). It has been said that the adoption by a tribe of the law and order code makes the code tribal law, not federal law. (Oliver v. Udall, 1962, 113 U.S.App.D.C. 212, 306 F.2d 819). And the fact that all Indians are now citizens does not affect the jurisdiction of tribal courts. (Iron Crow v. Oglala Sioux Tribe of Pine Ridge Res., supra, cf. United States

v. Nice, 1916, 241 U.S. 591, 598, 36 S. Ct. 696, 60 L.Ed. 1192; Winton v. Amos, 1921, 255 U.S. 373, 392, 41 S.Ct. 342, 65 L.Ed. 684).

All of these cases, and many others, however, recognize the basic proposition stated in Winton v. Amos, supra, at p. 391, 41 S.Ct. at p. 349: "It is thoroughly established that Congress has plenary authority over the Indians and all their tribal relations." See, for example, Oliver v. Udall, supra. And it is now the law, whatever may once have been the rule, that Indian reservations are a part of the territory of the United States. See United States v. Kagama, supra, where the court said (118 U.S. at 379, 6 S.Ct. at 1111):

> "But these Indians are within the geographical limits of the United States. The soil and the people within these limits are under the political control of the government of the United States, or of the states of the Union."

It has been said that the Constitution applies to the Indians, in the conduct of tribal affairs, only when it expressly binds them, or is made binding by treaty or act of Congress. (Native American Church v. Navajo Council, supra; Cohen, Handbook of Federal Indian Law, 1942, pp. 124, 181). We doubt the present validity of this proposition, as so broadly stated, but we confine our decision to the question actually before us. No case has been cited to us that holds that the courts of the United States do not have jurisdiction to issue writs of habeas corpus to inquire into the legality of the imprisonment of an Indian pursuant to an order or judgment of an Indian court. One case has squarely held that the Thirteenth Amendment prohibiting slavery "within the United States, or any place subject to their jurisdiction," does apply to Indians, and this in a habeas corpus case. (In re Sah Quah, D.Alaska, 1886, 31 F. 327). That case, however, did not involve a person convicted in an Indian court, it relied on the very broad language of the Thirteenth Amendment, and it dealt with Alaska Indians, whose status is somewhat different (see Organized Village of Kake v. Egan, supra).

Most heavily relied upon by appellee, and most closely in point, is Talton v. Mayes, 1896, 163 U.S. 376, 16 S.Ct. 986, 41 L.Ed. 196. There, an Indian of the Cherokee nation, convicted of murder in a Cherokee court, sought a writ of habeas corpus in a federal court. He asserted that his conviction was void because he had been indicted by a five-man grand jury, as provided by tribal law, and was thus deprived of his right to a grand jury as prescribed by the Sixth Amendment to the Constitution. Denial of the writ was affirmed. The court did not hold that the district court was without jurisdiction. It decided the question on the merits. It relied in large part on the treaty with the Cherokee, which expressly preserved the exclusive jurisdiction of their courts. It said that the offense was against the Cherokee Nation, not the United States, whose laws do not apply, that the Fifth Amendment applies only to the United States, and that the powers exercised by the Cherokee were not federal powers, citing Cherokee Nation v. State of Georgia, 1881, 30 U.S.(5 Pet.) 1, 8 L.Ed. 25, and Worcester v. State of Georgia, supra. But it also said:

> "True it is that in many adjudications of this court the fact has been fully recognized that, although possessed of these attributes of local self government, when exercising their tribal functions, all such rights are subject to the supreme legislative authority of the United States. Cherokee Nation v. Southern Kan. Ry. Co., 135 U.S. 641, 10 S.Ct. 965, 34 L.Ed. 295, where the cases are fully reviewed. But the existence of the right in congress to regulate the manner in which the local powers of the Cherokee Nation shall be exercised does not render such local powers federal powers arising from and created by the constitution of the United States. It follows that, as the powers of local self govern-

ment enjoyed by the Cherokee Nation existed prior to the constitution, they are not operated upon by the fifth amendment, which, as we have said, had for its sole object to control the powers conferred by the constitution on the national government. The fact that the Indian tribes are subject to the dominant authority of congress, and that their powers of local self-government are also operated upon and restrained by the general provisions of the constitution of the United States, completely answers the argument of inconvenience which was pressed in the discussion at bar. The claim that the finding of an indictment by a grand jury of less than 13 violates the due process clause of the fourteenth amendment is conclusively answered by Hurtado v. People of State of California, 110 U.S. 516, 4 S.Ct. 111, 292, 28 L.Ed. 232, and McNulty v. People of State of California, 149 U.S. 645, 13 S.Ct. 959, 37 L.Ed. 882."

Here, reliance is upon the due process clause, not the indictment clause. The *language* of the case supports appellee; the holding, however, is narrower. We note particularly that the Cherokee treaty provided that the laws of the Cherokee "shall not be inconsistent with the constitution of the United States," and the court's reference to "the general provisions of the Constitution," which, it apparently thought, do apply. Whether the court was of this opinion because of the language of the treaty, or otherwise, does not appear.

None of the other cases upon which tribal counsel relies in support of the order appealed from is as closely in point. Worcester v. State of Georgia, supra, sustains the treaty rights of the Cherokee nation against the pretentions of the State of Georgia. It does not deal at all with whether a federal court may issue a writ of habeas corpus at the behest of an Indian imprisoned under orders of a tribal court. Ex parte Crow Dog, supra, recognized the jurisdiction of the Indian courts. It dealt directly with the jurisdiction of a federal court, which was held not to have jurisdiction of the offense in question because that offense was under the exclusive jurisdiction of an Indian court. Iron Crow v. Oglala, Sioux Tribe, supra, held that an Indian court had jurisdiction of a charge of adultery committed by Indians on the Pine Ridge Reservation. It did not touch upon the question of whether the Constitution applies to the procedure of Indian courts. The court said: "The facts which were the basis for the verdict of guilty in the proceedings before the Tribal Court and the fairness of the procedures of the Tribal Court are not disputed or involved in this case." All that the court held was that the Indian court did have jurisdiction of the offense, which is not disputed here. Native American Church v. Navajo Tribal Council, supra, refused to enjoin the enforcement of a Navajo tribal council ordinance against the use on the reservation of the drug peyote. The court rested its decision on the proposition that the federal constitution is binding upon the Indian nations only where it expressly binds them or is made binding on them by treaty or some act of Congress. It held, therefore, that the Native American Church, which claimed that the use of peyote was a part of its religious practice, could not invoke the First Amendment to enjoin enforcement of the ordinance. The Eighth Circuit used the same reasoning in upholding the validity of an Indian tax against an attack based upon the Fifth and Fourteenth Amendments to the Constitution. (Barta v. Oglala Sioux Tribe of Pine Ridge Res., 8 Cir., 1958, 259 F.2d 553). These cases do not decide whether, if an Indian were convicted in an Indian court, the federal court could inquire into the propriety of the conviction in a proceeding in habeas corpus.

█ In spite of the theory that for some purposes an Indian tribe is an independent sovereignty, we think that, in the light of their history, it is pure fiction to say that the Indian courts func-

tioning in the Fort Belknap Indian community are not in part, at least, arms of the federal government. Originally they were created by the federal executive and imposed upon the Indian community, and to this day the federal government still maintains a partial control over them. In Iron Crow v. Oglala Sioux Tribe of Pine Ridge Res., supra, the court held that comparable Indian courts "have been authorized by federal legislative action" (231 F.2d at 94) and that "federal legislative action and rules promulgated thereunder support the authority of the Tribal Courts." (Id. at 96)

Under these circumstances, we think that these courts function in part as a federal agency and in part as a tribal agency, and that consequently it is competent for a federal court in a habeas corpus proceeding to inquire into the legality of the detention of an Indian pursuant to an order of an Indian court. We confine our decision to the courts of the Fort Belknap reservation. The history of other Indian courts may call for a different ruling, a question which is not before us.

The writ of habeas corpus lies on behalf of anyone who is "in custody under or by color of the authority of the United States" or "in violation of the Constitution * * * of the United States." (28 U.S.C. § 2241(c) (1) and (3)). We think that this covers Mrs. Colliflower's case. (Cf. Elk v. Wilkins, 1884, 112 U.S. 94, 108, 5 S.Ct. 41, 28 L.Ed. 643).

It may well be that one hundred years ago it would have been held that a federal court lacked jurisdiction to issue a writ of habeas corpus at the instance of an Indian imprisoned in a tribal jail, pursuant to the judgment of a tribal court. We think, however, that the status of the Indians today is such, and particularly that the history and status of the tribal court at the Fort Belknap Reservation is such, that we should uphold the jurisdiction of a federal court in this habeas corpus proceeding.

We do not pass upon the merits of Mrs. Colliflower's claims, because the district court did not reach them. It does not follow from our decision that the tribal court must comply with every constitutional restriction that is applicable to federal or state courts. Nor does it follow that the Fourteenth Amendment applies to tribal courts at all; some of the cases cited above indicate that it does not. And the vestige of "sovereignty" that the tribe retains and exercises through its Tribal Council and Tribal Courts may call for application of the principles applied in such cases as Territory of Hawaii v. Mankichi, 1903, 190 U.S. 197, 217–218, 23 S.Ct. 787, 47 L.Ed. 1016; Downes v. Bidwell, 1901, 182 U.S. 244, 276–277, 282–283, 21 S. Ct. 770, 45 L.Ed. 1088; Dorr v. United States, 1904, 195 U.S. 138, 146–148, 24 S.Ct. 808, 49 L.Ed. 128 and Talton v. Mayes, supra.

The order is reversed and the matter is remanded for further proceedings.