The QUECHAN TRIBE OF INDIANS, Plaintiff-Appellee,

v.

Raymond ROWE, Sheriff of Imperial County, et al., Defendants-Appellants.

No. 72–3199.

United States Court of Appeals, Ninth Circuit.

Feb. 2, 1976.

---

James H. Harmon, County Counsel (argued), El Centro, Cal., for defendants-appellants.

Ronald A. Albu (argued), of Cal. Indian Legal Services, Escondido, Cal., for plaintiff-appellee.

Lawrence E. Shearer, Atty. (argued), Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D. C., for amicus U. S.

## OPINION

Before CHAMBERS and WALLACE, Circuit Judges, and EAST,* District Judge.

CHAMBERS, Circuit Judge:

The Quechan Tribe of Indians, which resides on and governs the Fort Yuma Indian Reservation located along the Colorado River,[1] was organized under the Indian Reorganization Act of 1934, 48 Stat. 984, 25 U.S.C. §§ 461–479. The Secretary of the Interior approved the Constitution and Bylaws of the Quechan Tribe in 1936.

Article XI of those Bylaws authorizes the adoption of tribal ordinances "for the control of hunting and fishing on the reservation . . ." To that end the tribe has enacted three ordinances. Ordinance number QT–4 prohibits the use of rifles on the reservation and requires non-members of

---

* The Honorable William G. East, Senior Judge of the United States District Court for the District of Oregon, sitting by designation.

1. Approximately ninety-five percent of the reservation is located in Imperial County, California. The remaining five percent is located in Mohave County, Arizona. The entire reservation encompasses 9,281 acres.

the tribe to obtain tribal permits before pursuing game on the reservation. Non-members are also required to observe the game laws of the State of California while on the reservation. Ordinance 5–60 declares that any non-Indian hunting or fishing on the reservation without a tribal permit is guilty of trespass and subject to arrest by a tribal officer, who is to take the trespasser before the tribal court or to require him to sign a citation agreeing to appear before the court. Upon conviction the tribal court must assess damages against the trespasser and fine him no less than five dollars but not more than fifty dollars. Ordinance 8–6–64 defines trespass in much the same manner as Ordinance 5–60 but provides that trespassers are to be referred to federal officials for prosecution under 18 U.S.C. § 1165.

During the tribe's dove season in September of 1971, Alfred Buker, chief game warden of the Quechan Tribe and an officer of the Bureau of Indian Affairs charged with enforcement of § 1165, encountered three non-Indian youths believed to be violating the three ordinances as well as § 1165.[2] Buker did not arrest the youths, but he did confiscate their weapons, explaining that they could reclaim them at a later date at the tribal headquarters. The youths reported the incident to the Imperial County sheriff's office, whose officers arrested Buker for grand theft of the weapons. Buker was released after two hours and the charges against him were dismissed.

The Quechan Tribe filed this action against the arresting officers seeking declaratory and injunctive relief on the ground that the threat of future arrests prohibited the tribe from enforcing its tribal game ordinances. The district court entered summary judgment for the tribe, declaring that it has the right to control, regulate and license hunting and fishing on the reservation. The court also enjoined the defendants "from . . . arresting . . . or otherwise interfering with identified Tribal Game Wardens or with Deputy Special Officers of the Department of the Interior acting in discharge of their duties to enforce federal laws and regulations and ordinances of Plaintiff Tribe regulating hunting, trapping and fishing within the boundaries of the Ft. Yuma Indian Reservation."

 We hold that the Quechan Tribe was entitled to summary judgment but that it was not yet entitled to injunctive relief. The prime prerequisite for injunctive relief is the threat of irreparable future harm. *Sellers v. Regents of the University of California,* 432 F.2d 493, 497 (9th Cir. 1970), cert. denied 401 U.S. 981, 91 S.Ct. 1194, 28 L.Ed.2d 333 (1971). No such threat is present in this case. Neither the defendants nor any other county officials have any current action pending against the tribe or any of its members, and there is no indication that the defendants or other county officials are threatening any future action in derogation of the tribe's rights, whatever they might be declared to be. See *Sellers, supra; Giumarra Vineyards Corp. v. Farrell,* 431 F.2d 923 (9th Cir. 1970).

Although we do not dispute the district court's declaration of the tribe's right, we believe that in order to minimize the possibility of future conflicts between the parties it is necessary to interpolate its declaration. A simple confirmation of the tribe's right to control hunting and fishing on the reservation might be nugatory.

 The Quechan Tribe's jurisdiction over non-members[3] who enter the reservation to hunt or fish is grounded on a combination of rights. In the absence of treaty provisions or congressional pronouncements to the contrary, the tribe has the inherent power to exclude non-members from the reservation. *Williams v. Lee,* 358 U.S. 217, 219, 79 S.Ct. 269, 3 L.Ed.2d 257 (1959);

---

**2.** Although a dispute remains as to whether the youths were on the reservation prior to their encounter with Buker, they were on the reservation when he confiscated their weapons.

**3.** This opinion is limited in all respects to the relationships between the Quechan Tribe and non-members of the tribe.

*Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 561, 8 L.Ed. 483 (1833). That right is supplemented by the tribe's express powers to govern its internal affairs, Quechan Const., Art. IV, § 17, and to control hunting and fishing on the reservation, id., Art. XI. In addition, the tribe has the express right to maintain a tribal police force with full jurisdiction over the reservation, except as to those matters within the exclusive provinces of state or federal officials. Quechan Bylaws, Art. XIII.

■ Given those powers, the Quechan Tribe may exercise several types of authority over non-members who enter the reservation to hunt or fish. These are the rights to determine who may enter the reservation; to define the conditions upon which they may enter; to prescribe rules of conduct; to expel those who enter the reservation without proper authority or those who violate tribal, state or federal laws; to refer those who violate state or federal laws to state or federal officials; and to designate officials responsible for effectuating the foregoing.

■ It is argued on behalf of the tribe that its tribal court has the inherent authority to assert criminal jurisdiction over non-members of the tribe who violate tribal laws while on the reservation. This power is said to be found in general Indian law.[4] We need not refer to general Indian law to resolve the question in this case, however, because the answer is found in the Quechan Constitution itself. Article IV, Section 7 of that Constitution provides: "The Council shall have the power to promulgate ordinances . . . and to establish minor courts . . . for the trial and punishment of members of the Tribe charged with the commission of offenses set forth in such ordinances." Consequently, the Quechan Tribe, if it had the power to try non-members of the tribe for violation of tribal law, has foresworn it.

■ Nor, in view of the foregoing, may the Quechan Tribe cause any non-member who enters the reservation to forfeit his weapons or any other property as a consequence of violating tribal law. "[A]s Mr. Justice Bradley aptly pointed out in *Boyd,* a forfeiture proceeding is quasi-criminal in character. Its object, like a criminal proceeding, is to penalize for the commission of an offense against the law." *One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 700, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965).

Here the trouble seems to have arisen because of the tribal officer's insistence on keeping the weapons for tribal prosecution. If an Indian officer catches an offender in the act of violating the law, he might be able to make a lawful arrest and take the offender, along with the evidence, promptly to the proper jurisdiction. We do not rule in this area now, but leave it to the district court to make the first ruling.

In conclusion, we affirm the grant of summary judgment, but we remand the case to the district court for entry of an order dissolving the injunction and declaring the rights of the Quechan Tribe to be in conformity with the foregoing opinion.

In a delicate area such as we have here, an injunction should be the last resort. We do not hold that there can never be one.

WALLACE, Circuit Judge (concurring):

I concur with the result reached by the majority but reach it by a different path.

---

4. As a matter of general Indian law, tribal courts are residuals of each tribe's semi-sovereign existence, having criminal jurisdiction over all persons and offenses within the tribes' domains, to the extent that such jurisdiction is not inconsistent with treaties, agreements or federal enactments. *Colliflower v. Garland,* 342 F.2d 369, 376 (9th Cir. 1965); *Iron Crow v. Oglala Sioux Tribe,* 231 F.2d 89 (8th Cir. 1956). We do not decide whether there is any congressional policy which might prohibit tribal courts in general from asserting criminal jurisdiction over non-tribal members who violate tribal laws on tribal lands. That question remains unanswered. *Compare* Sol.I.D., M–36810 (Aug. 10, 1970), *with* H.R.Rep.No.474, 23d Cong., 1st Sess. 13, 18 (1834). Thus, we express no opinion on the possible consequences of amending Article IV, Section 7, of the Quechan Constitution.

Buker was an officer of the Bureau of Indian Affairs and had the authority and responsibility to enforce federal and tribal laws pursuant to 18 U.S.C. § 1165. That authority extended to non-Indians and clothed him with the legal power to prevent non-Indians from hunting on the reservation without consent of the tribe. The three youths did not have the tribe's consent, which is granted only with the purchase of a tribal permit. Buker could have reasonably concluded that they came on to the reservation to hunt. The tribe's dove season was open; the youths had at least one gun that could have been used for dove hunting; and Buker had heard shots coming from the area where the youths had been.

As Buker had authority over the non-Indians, we do not need to decide whether he had *actual* authority to take the boys' guns. All we need to conclude is that he was acting in good faith to enforce a federal law which he had authority to enforce. It is undisputed that Buker was acting in good faith. If his alleged criminal act was done in good faith pursuant to a duty imposed upon him by federal law, he is immune from state criminal prosecution. *See John-son v. Maryland,* 254 U.S. 51, 56–57, 41 S.Ct. 16, 65 L.Ed. 126 (1920); *In re Neagle,* 135 U.S. 1, 75, 10 S.Ct. 658, 34 L.Ed. 55 (1890); *In re McShane,* 235 F.Supp. 262 (N.D.Miss. 1964). *Cf. Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).

It is true that the subjective good faith of an officer would not be sufficient to immunize him from criminal prosecution if his conduct was so outrageous that a reasonable officer could not conclude that it was within the scope of his authority or that his actions were reasonably required by the situation. But Buker's action in taking the guns was not so outrageous as to be clearly beyond the scope of his authority. The incident occurred just before dark. The youths were obviously angered by his stopping them. He could have reasonably concluded that his action was necessary to protect the residents of the reservation.

He testified that his main concern in taking the guns was to protect the reservation residents since it was getting dark.

As Buker was immune from state criminal prosecution, it follows that the sheriff was without authority to arrest him and that the district court's judgment of declaratory relief was correct.

Therefore, I do not believe it is necessary for us to decide whether the tribe and its courts have jurisdiction over these young men. I hesitate to do so for two reasons. First, I have serious questions as to the legal theory adopted by the majority. Second, the question of whether the tribe has jurisdiction over non-Indians was not raised before the district court and I would prefer the question to be fully ventilated before we decide it. *See Westinghouse Electric Corp. v. Weigel,* 426 F.2d 1356 (9th Cir. 1970); *Inman-Poulsen Lumber Co. v. Commissioner of Internal Revenue,* 219 F.2d 159 (9th Cir. 1955). The resolution of what authority a tribe has over non-Indians has serious consequences and is an issue upon which there is a diversity of opinions. The developmental process before the district court would provide us with a better foundation upon which to make our decision. As there exists an alternative ground, as I point out above, to sustain the judgment of the district court, there will be no miscarriage of justice and, therefore, I do not believe we are justified in deciding the issue. *See Hormel v. Helvering,* 312 U.S. 552, 556–57, 61 S.Ct. 719, 85 L.Ed. 1037 (1941).