**Mark David OLIPHANT, Plaintiff-Appellant,**

v.

**Edward SCHLIE, Chief of Police of the City of Bremerton, et al., Defendant-Appellees.**

No. 74–2154.

United States Court of Appeals, Ninth Circuit.

Aug. 24, 1976.

Philip P. Malone (argued), Poulsbo, Wash., for plaintiff-appellant.

Barry Ernstoff (argued), Seattle, Wash., for defendant-appellees (Suquamish Tribe).

Before DUNIWAY and KENNEDY, Circuit Judges, and BURNS,* District Judge.

DUNIWAY, Circuit Judge:

This case involves a question of Indian law which has been unresolved since it first arose almost a century ago: what is the jurisdiction of an Indian tribe over non-Indians who commit crimes while on Indian tribal land within the boundaries of the reservation? *See Ex parte Kenyon,* C.C.W. D.Ark., 1878, Fed.Cas.No.7720, 14 Fed.Cas. 353. Oliphant was arrested on the Port Madison Indian Reservation in the state of Washington by Suquamish tribal police on August 19, 1973, and charged before the Provisional Court of the Suquamish Indian Tribe with assaulting an officer and resisting arrest. He was incarcerated by order of the tribal court in lieu of $200 bail, but then released on his own recognizance by that court. Before trial he petitioned the United States District Court for a writ of habeas corpus, alleging that an Indian tribal court can have no jurisdiction over a non-Indian. The district court denied the writ and Oliphant appeals. We affirm.

█ Jurisdiction in this case is founded on 25 U.S.C. § 1303 and 28 U.S.C. §§ 2241(c)(1) and (3). *See Colliflower v. Garland,* 9 Cir., 1965, 342 F.2d 369, 379. Oliphant's release on his own recognizance did not deprive the district court of jurisdiction. *Hensley v. Municipal Court,* 1973, 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294.

█ Oliphant argues that the Suquamish have no jurisdiction over non-Indians be- cause Congress never conferred such jurisdiction on them. This misstates the problem.[1] The proper approach to the question of tribal criminal jurisdiction is to ask "first, what the original sovereign powers of the tribes were, and, then, how far and in what respects these powers have been limited." Powers of Indian Tribes, 1934, 55 I.D. 14, 57. *See Ortiz-Barraza v. United States,* 9 Cir., 1975, 512 F.2d 1176, 1179. "It must always be remembered that the various Indian tribes were once independent and sovereign nations . . . ." *McClanahan v. Arizona State Tax Comm.,* 1973, 411 U.S. 164, 172, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129, who, though conquered and dependent, retain those powers of autonomous states that are neither inconsistent with their status nor expressly terminated by Congress. *Worcester v. Georgia,* 1832, 6 Pet. (31 U.S.) 515, 560–61, 8 L.Ed. 483; *Cherokee Nation v. Georgia,* 1831, 5 Pet. (30 U.S.) 1, 17–18, 8 L.Ed. 25.

Surely the power to preserve order on the reservation, when necessary by punishing those who violate tribal law, is a sine qua non of the sovereignty that the Suquamish originally possessed. As the Eighth Circuit held seven decades ago when it upheld the right of the Creek Nation to tax non-Indian residents:

It was one of the inherent and essential attributes of its original sovereignty. It was a natural right of that people, indispensable to its autonomy as a distinct tribe or nation, and it must remain an attribute of its government until by the agreement of the nation itself or by the

---

* The Honorable James M. Burns, United States District Judge for the District of Oregon, sitting by designation.

1. The dissenting opinion similarly misstates the problem. The question is not whether Congress has conferred jurisdiction upon the tribe. The tribe, before it was conquered, had jurisdiction, as any independent nation does. The question therefore is, did Congress (or a treaty) take that jurisdiction away? The dissent points to no action by the Congress, and no treaty language, depriving the tribe of jurisdiction. The language of the 1791 treaty with the Cherokees, cited in footnote 5 of the dissent, is no more than a waiver of the right that all nations retain, to endeavor, through diplomatic means, to protect their citizens who go or reside abroad. The waiver is limited to those citizens who elect to settle on Indian land. It does not, expressly or by implication, reject the universal rule that one who visits another nation subjects himself to its jurisdiction. It does not imply that absent the treaty provision, the Cherokees would have lacked jurisdiction. Much less does it imply that the jurisdiction of the Cherokees over citizens was to be limited to those who settled on Cherokee lands. A citizen visitor to the Cherokee nation, like the settler, would be subject to its jurisdiction, but, unlike the settler, could invoke the diplomatic protection of the United States.

superior power of the republic it is taken from it. *Buster v. Wright,* 8 Cir., 1905, 135 F. 947, 950, *appeal dismissed,* 1906, 203 U.S. 599, 27 S.Ct. 777, 51 L.Ed. 334.

The Supreme Court, in dictum, has declared not only that Indian tribes have criminal jurisdiction, but that "if the crime was by or against an Indian, tribal jurisdiction or that expressly conferred on other courts by Congress has remained exclusive." *Williams v. Lee,* 1959, 358 U.S. 217, 220, 79 S.Ct. 269, 270, 3 L.Ed.2d 251.

As we recently said in *United States v. Burns,* 9 Cir., 1975, 529 F.2d 114 (1975):

Just as state law is not to apply on Indian lands, unless expressly authorized by federal statute, so also, federal enclave law is not to apply unless expressly authorized. 529 F.2d at 117.

■ We turn to the relevant treaties and Congressional acts to see whether any has withdrawn from Suquamish the power to punish Oliphant for a violation of the tribal law and order code. Our approach is influenced by the long-standing rule that "legislation affecting the Indians is to be construed in their interest."[2] *United States v. Nice,* 1916, 241 U.S. 591, 599, 36 S.Ct. 696, 60 L.Ed. 1192; *Santa Rosa Band of Indians v. Kings County,* 9 Cir., 1975, 532 F.2d 655, at 660–661 (1975). *See also Bryan v. Itasca County,* 1976, 426 U.S. 373, at 391–393, 96 S.Ct. 2102, 2113–2114, 48 L.Ed.2d 710; *McClanahan v. Arizona State Tax Comm.,* supra, 411 U.S. at 174, 93 S.Ct. 1257.

The starting point in determining how much of their original sovereignty the Suquamish have lost is the Treaty of Point Elliott, 12 Stat. 927 (1859), the first treaty between these people and the United States. While other treaties with other tribes had expressly granted or withdrawn the power to try non-Indian criminals, the Treaty of Point Elliott was silent on the subject. M. Price, Law and the American Indian 22–27 (1973). The only significant surrender of internal autonomy was con-

tained in Article IX of the Treaty, in which the Indian signatories agreed not to "shelter or conceal offenders against the law of the United States, but to deliver them up to the authorities for trial." 12 Stat. 929. *See Arizona ex rel. Merrill v. Turtle,* 9 Cir., 1969, 413 F.2d 683, *cert. denied,* 1970, 396 U.S. 1003, 90 S.Ct. 551, 24 L.Ed.2d 494.

■ The second and last treaty or agreement between the Suquamish and the United States, 33 Stat. 1078 (1905), involved the relinquishment of land by the Indian tribes residing on the Port Madison reservation. It did not mention the transfer of any powers and specifically provided that it did not deprive the Indians of any benefits "not inconsistent with the provisions of this agreement." 33 Stat. 1079. No treaty has deprived the Suquamish of criminal jurisdiction over Oliphant. We therefore shift our attention to Congressional acts.

■ Oliphant relies on three statutes to support his thesis that Indian tribes do not have criminal jurisdiction over non-Indians. First, he argues that 18 U.S.C. § 1152 has withdrawn criminal jurisdiction over non-Indians from Indian tribes. We cannot read § 1152 as withdrawing from Indian tribes criminal jurisdiction that they otherwise possess. It extends federal criminal laws applicable to federal enclaves to Indian country, but it does not attempt either to extinguish tribal jurisdiction or to declare federal jurisdiction exclusive. In light of the principles of statutory construction enunciated in *Nice, supra,* and *Santa Rosa Band of Indians, supra,* this could end our inquiry. However, we find additional support in the legislative history of § 1152.

Section 1152 originated as § 4 of the Indian Trade and Intercourse Act of 1802, 2 Stat. 141. It was reenacted in 1817 (3 Stat. 383), 1834 (§ 25 of the Trade and Intercourse Act, 4 Stat. 733), and 1854 (§ 3 of the Act of March 27, 1854, 10 Stat. 270), when it was modified to eliminate the possibility that an Indian subjected to tribal discipline could also be tried in federal court.[3] Ex-

---

**2.** The dissent also flies in the face of this long standing rule.

**3.** That this measure did not also protect non-Indians against double jeopardy does not indicate

cept for minor language changes when it was incorporated into the Revised Statutes and later into the United States Code, § 1152 has not changed since 1854.

Our reading of the Congressional history convinces us that § 1152 was not intended, and should not be read, to prohibit Indian tribes from prosecuting non-Indians for offenses against tribal law committed on the reservation. Section 1152 can be explained more rationally as an attempt to protect Indian tribes, who had no established legal system and whose authority was frequently challenged by unsympathetic state governments, *see Cherokee Nation v. Georgia, supra,* from depredations by "unprincipled white men." H.R.Rep.No.474, 23 Cong., 1st Sess. 98 (1834).

> [I]t is rather of courtesy than of right that we undertake to punish crimes committed in that territory by and against our own citizens. And this provision of [§ 25 of the Trade and Intercourse Act of 1834] is retained principally on the ground that it may be unsafe to trust to Indian law in the early stages of their Government. *Id.* at 13.[4]

Only one case cited by Oliphant, *Ex parte Kenyon, supra,* tends to support his argument that § 1152 deprives Indian tribes of jurisdiction over non-Indians.[5] *Kenyon,* however, concerned a crime committed outside the territorial boundaries of "Indian country," a fact which figured prominently in the court's opinion. *See Elk v. Wilkins,* 1884, 112 U.S. 94, 108, 5 S.Ct. 41, 28 L.Ed. 643. The assertion that an Indian tribe can have no jurisdiction over a non-Indian was dictum, mentioned only in passing and without supporting authority. Our *de novo*

examination of Indian law decisions since *Cherokee Nation v. Georgia, supra,* convinces us that the statement by Judge Parker in *Kenyon* and cited as supporting Oliphant's position is wrong. Law and The American Indian, *supra,* 171–75; Recent Developments, *Indian Tribal Courts,* 18 St. Louis U.L.J. 461, 462–64 (1975).

█ Second, Oliphant argues that the Indian Civil Rights Act of 1968, 25 U.S.C. § 1302, ousts the tribal court of jurisdiction. That Act applies certain due process requirements to Indian tribes exercising powers of self-government because the Supreme Court in *Talton v. Mayes,* 1896, 163 U.S. 376, 16 S.Ct. 986, 41 L.Ed. 196, had held that the Bill of Rights in the Federal Constitution did not apply to Indian tribal governments. Nothing in the Indian Bill of Rights purports to withdraw any criminal jurisdiction of the Indian tribes. It recognizes such jurisdiction, but prescribes certain due process type limitations upon its exercise.

Section 1302 provides: "No Indian tribe in exercising powers of self-government shall—. . . (7) . . . impose for conviction of any one offense any penalty or punishment greater than imprisonment for a term of six months or a fine of $500, or both; . . . (10) deny to any person accused of an offense punishable by imprisonment the right, upon request, to a trial by jury of not less than six persons." Oliphant argues that a fair trial for him is impossible because non-Indians would be excluded from the venire. This issue is raised prematurely. Oliphant is entitled to a fair trial; if he should be denied one, appeal from a conviction or a petition for a

that only Indians were susceptible to federal and tribal discipline. Passed during the Kansas-Nebraska debates of 1854, this measure was disposed of rapidly and almost without debate. Section 3 may well have protected only Indians from double jeopardy merely because, in the only case in which a person had suffered both tribal and federal punishment, the defendant happened to be a Creek Indian. 23 Cong. Globe 700–01 (1854).

**4.** As stated in the House Report on a companion bill to establish a western Indian territory: "As to those persons not required to reside in

the Indian country, who voluntarily go there to reside, they must be considered as voluntarily submitting themselves to the laws of the tribes." *Id.* at 18.

**5.** The additional authorities cited by Oliphant, F. Cohen, Handbook of Federal Indian Law 148 (1945) and Criminal Jurisdiction of Indian Tribes over Non-Indians, 1970, 77 I.D. 113, *withdrawn* January 25, 1974, base their conclusions entirely on *Kenyon.* They are, therefore, only as persuasive as their source.

writ of habeas corpus would then be appropriate. Further discussion of this contention is unnecessary.

Third, Oliphant argues that § 7 of Public Law 280 (P.L. 83–280, 67 Stat. 590, 1953, modified by P.L. 90–284, § 401, 82 Stat. 78, 1968; 25 U.S.C. § 1321) deprives the Suquamish of jurisdiction over him. This statute permits a state to assume certain criminal jurisdiction in Indian country, with the consent of the affected tribe. Pursuant to this law, Washington adopted a statute, Laws of 1957, ch. 240, assuming jurisdiction whenever the governor of the state received the tribal assent. The Suquamish consented and on May 15, 1958, the Governor proclaimed the effectiveness of the state jurisdiction.

However, in 1968, Congress provided for retrocession by a state of the jurisdiction assumed by it under § 1321. P.L. 90–284, 82 Stat. 79, 25 U.S.C. § 1323. On August 26, 1971, the Governor of Washington proclaimed retrocession to the United States of jurisdiction over the Suquamish Port Madison Indian Reservation. By Executive Order No. 11435, 33 F.R. 17339, the President designated the Secretary of the Interior as authorized to exercise the authority of the United States under § 1323, his acceptance of retrocession to be effective by being published in the Federal Register. On April 14, 1972, the Secretary accepted the retrocession proclaimed by the Governor. 37 F.R. 7353.

■ Oliphant argues that the Governor's proclamation was invalid under the state law and can have no effect. In our opinion, the question is one of federal law, not state law. The acceptance of the retrocession by the Secretary, pursuant to the authorization of the President, made the retrocession effective, whether or not the Governor's proclamation was valid under Washington law. In this respect, we agree with the views of Judge Denney in *United States v. Brown,* D.Neb., 1971, 334 F.Supp. 536, 540–41:

> The federal government, having plenary power over the Indians, had the power to prescribe any method or event it desired to trigger its own re-assumption of

control over Indian affairs within a state. In fact, the triggering event could have been devoid of any mention of state action at all.

> The plenary power of the federal government over Indian affairs, the inescapable difficulty of requiring the Secretary to delve into the internal workings of the state government, and the reliance of the federal government upon what appeared to have been a valid state action, are all factors to be considered and lead the Court to the conclusion that the federal interpretation of the effectiveness of state action triggering the re-assertion of federal jurisdiction is and was controlling. "Retrocession" does not imply any particular procedure or action on the part of the states involved and the need for finality and importance of the various competing interests here dictates that the state action presented complies with the federal requirements of "retrocession."

> The federal government, having the power to preempt jurisdiction over the Omaha Reservation, had the power to so define and construe the word "retrocession" as to remove from the determination of federal assumption of jurisdiction any question of the procedural validity or invalidity of the state's act of retrocession. Considering the problems presented by any other holding, the Court holds that the term "retrocession," as determined by the Secretary of Interior, was fulfilled by such action as the state took in Resolution 37.

To the same effect is *Omaha Tribe v. Village of Walthill,* D.Neb., 1971, 334 F.Supp. 823, *affirmed,* 8 Cir., 1972, 460 F.2d 1327, *cert. denied,* 1973, 409 U.S. 1107, 93 S.Ct. 898, 34 L.Ed.2d 687.

■ Finally, we consider whether the exercise of criminal jurisdiction by the Suquamish in cases such as this one would interfere with or frustrate the policies of the United States. The sections of the tribal law and order code under which Oliphant is charged do not punish conduct otherwise privileged or authorize actions otherwise illegal under federal law. Thus no explicit

conflict exists. Moreover, the federal government has been encouraging Indian tribes to adopt law and order codes, set up tribal courts, and exercise authority over reservation lands. Goldberg, *Public Law 280: The Limits of State Jurisdiction over Reservation Indians*, 22 U.C.L.A.L.Rev. 535. Tribal criminal jurisdiction over non-Indians, as limited by the Indian Bill of Rights, is a small but necessary part of this policy.[6]

Not only does the law relating to Indian tribes support the jurisdiction here in question; practical considerations also support it. It may not be as true as it once was that "[t]hey [the Indians] owe no allegiance to the states, and receive from them no protection. Because of the local ill feeling, the people of the states where they are found are often their deadliest enemies." *United States v. Kagama*, 1886, 118 U.S. 375, 384, 6 S.Ct. 1109, 1114, 30 L.Ed. 228. But antagonism between reservation Indians and the surrounding populations does persist. History, broken promises, cultural differences and neglect all contribute to it. Reluctance on the part of the States to accord to the Indians rights guaranteed to them by treaties still exists. *See, e. g., United States v. Washington*, 9 Cir., 1975, 520 F.2d 676, and the concurring opinion of Judge Burns at page 693. Part of the problem no doubt stems from the tax exemptions that Indians enjoy. *See, e. g., McClanahan v. Arizona State Tax Commission, supra.*

This case well illustrates the need for the jurisdiction here involved. The events occurred on Suquamish Tribal encampment grounds, during a Tribal celebration known as Chief Seattle Days, at a time when a number of Indians were encamped on the Tribal grounds. Counsel for the Tribe describe the situation as follows: (appellees' brief, pages 27–28):

. . . When the Suquamish Indian Tribe planned its annual Chief Seattle Days celebration, the Tribe knew that

thousands of people would be congregating in a small area near the tribal traditional encampment grounds for the celebration. A request was made of the local county to provide law enforcement assistance. One deputy was available for approximately one 8-hour period during the entire weekend. The tribe also requested law enforcement assistance from the Bureau of Indian Affairs, Western Washington Agency. They were told that they would have to provide their own law enforcement out of tribal funds and with tribal personnel.

Appellant was arrested at approximately 4:30 A.M. The only law enforcement officers available to deal with the situation were tribal deputies. Without the exercise of jurisdiction by the Tribe and its courts, there could have been no law enforcement whatsoever on the Reservation during this major gathering which clearly created a potentially dangerous situation with regard to law enforcement. Public safety is an underpinning of a political entity. If tribal members cannot protect themselves from offenders, there will be powerful motivation for such tribal members to leave the Reservation, thereby counteracting the express Congressional policy of improving the quality of Reservation life.

Federal law is not designed to cover the range of conduct normally regulated by local governments. Minor offenses committed by non-Indians within Indian reservations frequently go unpunished and thus unregulated. Federal prosecutors are reluctant to institute federal proceedings against non-Indians for minor offenses in courts in which the dockets are already overcrowded, where litigation will involve burdensome travel to witnesses and investigative personnel, and where the case will most probably result in a small fine or perhaps a suspended sentence. Prosecutors in counties adjoin-

---

6. Our decision in *The Quechan Tribe of Indians v. Rowe*, 9 Cir., 1976, 531 F.2d 408, is not contrary to our conclusions. It applies the same principles that we apply, but finds in the tribal constitution an express limitation of the jurisdiction of tribal courts to "the trial and punishment of members of the Tribe." It leaves open the question that we now decide. (see p. 411 & fn. 4)

ing Indian reservations are reluctant to prosecute non-Indians for minor offenses where limitations on state process within Indian country may make witnesses difficult to obtain, where the jurisdictional division between federal, state and tribal governments over the offense is not clear, and where the peace and dignity of the government affected is not his own but that of the Indian tribe.

Traffic offenses, trespasses, violations of tribal hunting and fishing regulations, disorderly conduct and even petty larcenies and simple assaults committed by non-Indians go unpunished. The dignity of the tribal government suffers in the eyes of Indian and non-Indian alike, and a tendency toward lawless behavior necessarily follows.

The order appealed from is affirmed.

KENNEDY, Circuit Judge (dissenting):

I cannot agree with either the premises or the conclusion of the majority opinion, and therefore I respectfully dissent.

As the majority points out, the question whether Indian courts may exercise jurisdiction over non-Indians has remained unanswered for almost 100 years. The reason is that no federal court has had occasion to pass on the issue since *Ex parte Kenyon*, 14 Fed.Cas. 353 (No. 7720 W.D.Ark.1878). The very absence of legal authority to support the contentions made on behalf of the tribal court indicates to me that the jurisdiction it attempts to exercise is novel and unusual, and certainly inconsistent with prior practice.[1] While this does not necessarily make the procedure improper, it does call for careful examination of the purpose and history of tribal courts to determine whether an assertion of jurisdiction over non-Indians

is consistent with the powers granted by Congress to tribal governments during the last 100 years. Such an examination has persuaded me that Indian courts were not intended to have jurisdiction over non-Indians.

It is important to focus on the precise issue in this case. We are not considering whether Indian tribes may pass reservation ordinances, having the force of law, governing the conduct of the tribe's members; they may. *Colliflower v. Garland*, 342 F.2d 369, 376 (9th Cir. 1965). Nor are we determining whether Indians have the right to exclude from the reservation nonmembers they deem undesirable; they have. *Quechan Tribe of Indians v. Rowe*, 531 F.2d 408, 411 (9th Cir. 1976). Nor is there any question of potential lawbreakers going unpunished, a point given special emphasis by the majority, for we have held that tribal authorities have the power to apprehend violators of state and federal law and to deliver the offenders to the appropriate authority.[2] *Oriz-Barraza v. United States*, 512 F.2d 1176, 1179 (9th Cir. 1975). The sole question here is whether the accused, a non-Indian suspected of having committed a violation on the reservation, may be tried for the alleged offense before an Indian tribunal.

The answer to this question is not advanced by the majority's broad assertion that Indian tribes have inherent sovereignty presumed to exist in the absence of express congressional intent to the contrary. The broad dictum on Indian sovereignty pronounced by Chief Justice Marshall in *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 560–61, 8 L.Ed. 483 (1832), was a response to a state's attempted invasion of tribal privileges that had express federal sanction. As pointed out in a recent survey, Supreme

---

1. Certain tribal codes expressly prohibit the assumption of jurisdiction by the tribal court of non-Indian offenders. *See, e. g., Quechan Tribe of Indians v. Rowe*, 531 F.2d 408, 411 (9th Cir. 1976); 17 Navajo Tribal Code § 101 *et seq.; Hearings on the Constitutional Rights of the American Indian Before the Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary*, 87th Cong., 2d Sess., pt. 3, at 679 (1963); *id.* pt. 2, at 385.

2. By assaulting the tribal police officer, Oliphant was likely guilty of violating one or several of the following federal statutes: 18 U.S.C. §§ 111, 113, 1114, 1152. *See Stone v. United States*, 506 F.2d 561 (8th Cir. 1974), *cert. denied*, 420 U.S. 978, 95 S.Ct. 1405, 43 L.Ed.2d 659 (1975).

Court cases generally rely on the notion of tribal sovereignty in determining the extent to which states can properly exercise jurisdiction where the federal government has decreed a measure of autonomy for the tribes. Martone, *American Indian Tribal Self-Government in the Federal System: Inherent Right of Congressional License?* 51 Notre Dame Law. 600, 627 (1976). The term "sovereignty," then, is merely a veil used where the issue is, in fact, one of federal preemption of regulation in the field of Indian affairs. *Id.* at 629–31; *see McClanahan v. Arizona State Tax Commission*, 411 U.S. 164, 172, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973).[3]

A different problem is presented when the controversy is not one involving state encroachment on a tribal privilege conferred by Congress, but is rather the exercise of tribal jurisdiction over an individual. Principles of "tribal sovereignty" developed in the preemption context simply have no application here. This court, for example, long before Congress enacted 25 U.S.C. § 1303, did not hesitate to control the exercise of power by tribal governments by ordering the issuance of a writ of habeas corpus. *Colliflower v. Garland*, 342 F.2d 369 (9th Cir. 1965).

The concept of sovereignty applicable to Indian tribes need not include the power to prosecute nonmembers. This power, unlike the ability to maintain law and order on the reservation and to exclude undesirable nonmembers, is not essential to the tribe's identity or its self-governing status. In fact, even as to tribal members, tribal courts only possess jurisdiction over petty offenses involving less than six months imprisonment and $500 fine. 25 U.S.C. § 1302(7). Major crimes are prosecuted in federal court. 18 U.S.C. § 1153. Therefore I do not find the doctrine of tribal sovereignty analytically helpful in this context and instead find it necessary to look directly at the applicable legislation to determine whether Congress intended the tribal courts to have the power to exercise jurisdiction over nonmembers.

As early as the turn of the nineteenth century, Congress evidenced an intention to treat offenses by Indians against each other differently from offenses involving non-Indians. Offenses in the latter category, where either the perpetrator or the victim was a non-Indian, were proscribed by specific statute. Indian Trade and Intercourse Act of March 30, 1802, ch. 13, §§ 4, 14, 2 Stat. 141, 143–44. Offenses in the first category "were left to be dealt with by each tribe for itself, according to its local customs." *Ex parte Crow Dog,* 109 U.S. 556, 571–72, 3 S.Ct. 396, 406, 27 L.Ed. 1030 (1883). This policy, the Court explained, reflected a recognition that it would be unfair to apply white men's standards of justice to interactions exclusively between Indians, who belonged to a separate culture. *Id.* at 571, 3 S.Ct. 396. The Court noted, moreover, that tribal courts were an integral part of tribal self-government:

> The pledge to secure to these people . . . an orderly government . . . necessarily implies . . . that among the arts of civilized life, which it was the very purpose of all these arrangements to introduce and naturalize among them, was the highest and best of all,—that of self-government, the regulation by themselves of their own domestic affairs, the maintenance of order and peace *among their own members* by the administration of their own laws and customs.

*Id.* at 568, 3 S.Ct. at 404 (emphasis added).

These considerations are, of course, not applicable where a non-Indian commits a crime on a reservation. There is no danger, in trying a non-Indian in state or federal court, that he will be subjected to cultural

---

**3.** The power of Congress to divest tribes of any and all of their sovereign attributes is, of course, undisputed. For example, legislation has terminated the existence of various Indian tribes. 25 U.S.C. ch. 14.

As the Supreme Court recognized almost a century ago, only two truly sovereign entities exist at any place within the geographical limits of the United States: the federal government and the states of the union. *United States v. Kagama*, 118 U.S. 375, 379, 6 S.Ct. 1109, 30 L.Ed. 228 (1886).

standards to which he is not accustomed. Nor is such a trial in derogation of the tribe's ability to control its own members.

In light of the above, silence in the Treaty of Point Elliott on the subject of tribal court jurisdiction cannot be taken as an assent to jurisdiction over all persons. Such silence, if it imparts any information at all, must be understood in light of then prevailing policies, which do not appear to have permitted jurisdiction by Indian tribes over non-Indians.[4] In earlier treaties, in fact, Congress had in certain instances specified that Indians might have jurisdiction over white men.[5] This practice changed for later treaties.[6] An opinion of the Attorney General, issued the same year in which the Treaty of Point Elliott was signed, describes negotiations on this point with an Indian tribe:

> [T]he Choctaws express a wish in the treaty that Congress would grant to the Choctaws the right of punishing, by their own laws, "any white man" who shall come into the nation, and infringe any of their national regulations, (art. 4). But Congress did not accede to this request. On the contrary, it has made provision, by a series of laws, for the punishment of crimes affecting white men, committed by or on them in the Indian country, including that of the Choctaws, by the courts of the United States. (See act of June 30, 1834, iv Stat. at Large, p. 729, and act of June 17, 1844, v Stat. at Large, p. 680.) These Acts cover, so far as they go, all crimes except those committed by Indian against Indian.

7 Op.Att'y Gen. 174, 179 (1855). The contemporary refusal to grant other Indian tribes this very power over non-Indians indicates that the federal government did not consider such power an inherent attribute of tribal sovereignty. Absence of such an empowering provision in the treaty with the Suquamish raises a strong inference that Congress did not intend them to exercise such jurisdiction.

Modern day pronouncements of both Congress and the Interior Department reflect the view that tribal court jurisdiction does not extend to non-Indians. During House and Senate debates on the Indian Civil Rights Bill, supporters of the measure consistently referred to it as limiting "the power of tribal courts in dealing with tribal members."[7] No reference was made to the possibility that these courts might exercise

---

**4.** Even commentators who argue in favor of tribal court jurisdiction over non-Indians have recognized that this would be a novel practice and inconsistent with the views that have prevailed for over a century in Congress and the administrative agencies in charge of Indian affairs. M. Price, Law and the American Indian 174 (1973); see Davis, *Criminal Jurisdiction Over Indian Country in Arizona*, 1 Ariz.L.Rev. 62, 92–94 (1959).

Law and order regulations promulgated by the Department of the Interior for Courts of Indian Offenses are explicitly limited to offenses committed by Indians. 25 C.F.R. § 11.-2CA–11.87NH (1975). These regulations, which were first promulgated in 1892, *see* Report of Commissioner of Indian Affairs, T. J. Morgan, Aug. 27, 1892, *reprinted in* 1 W. Washburn, The American Indian and the United States 574 (1973), have been adopted as tribal codes by various Indian tribes. *See, e. g.,* Comment to § 1 of title 17 of the Navajo Tribal Code.

**5.** The 1791 treaty with the Cherokees, for example, provides:

If any citizen of the United States, or other person not being an Indian, shall settle on any of the Cherokees' lands, such person shall forfeit the protection of the United States, and the Cherokees may punish him or not, as they please.

Art. VIII, 7 Stat. 39, 40 (1791). This provision, of course, raises two separate inferences. First, the specific grant by Congress of jurisdiction over non-Indians who have settled on the reservation implies that such jurisdiction was not assumed to exist otherwise. More importantly, however, the grant of jurisdiction over certain whites only, those who have undertaken an affirmative act to affiliate themselves with the reservation, raises the strong inference that other whites were not subject to tribal jurisdiction.

**6.** U.S. Dep't of the Interior, Federal Indian Law 323 (1958) notes that such provisions in early treaties merely followed the practice accepted with respect to international treaties. Later treaties, however, evidenced a change in this policy.

**7.** *See* Remarks of Rep. Reifel, 114 Cong.Rec. 9552–53 (Apr. 10, 1968):

Basically, these titles would accomplish two major objectives: First, they would cre-

jurisdiction over nonmembers. A 1970 opinion by the Interior Department Solicitor[8] flatly concluded: "Indian tribes do not possess criminal jurisdiction over non-Indians[;] such jurisdiction lies in either the state or Federal Governments." 77 I.D. 113, 115 (1970).[9]

The current federal scheme for dealing with offenses on Indian land is consistent with the premise that Indian courts do not have jurisdiction over non-Indians. The interaction of sections 1152 and 1153 of title 18 of the Code leaves little doubt on this matter.

Section 1152 makes federal law, including the Assimilative Crimes Act, applicable to Indian country. Exempted from the operation of the section are two classes of individuals: (a) Indians who have committed offenses against the person or property of another Indian and (b) Indians who have committed offenses in Indian country for which they have been punished by the local law of the tribe. This provision can be traced back more than one hundred years to the Act of March 27, 1854, ch. 26, § 3, 10 Stat. 270. *See Ex parte Crow Dog, supra,* 109 U.S. at 558, 3 S.Ct. 396. The fact that

---

ate a bill of rights *for the protection of Indians* tried by tribal courts, and would improve the quality of justice administered by those courts; and second, they would provide for the assumption of civil and criminal jurisdiction by States over Indian country within their borders only with the consent of the tribes affected. Both of these objectives are important *to our Indian citizens;* the accomplishment of each of these objectives is long overdue.

Mr. Speaker, at the present time when *an Indian citizen* appears before State or Federal courts he is accorded the constitutional rights of all Americans. But when that *same Indian citizen* is brought to book before a tribal court, which has power to punish him usually for as long as 6 months in jail, he has only those rights which the tribe is willing to recognize. Many tribes have behaved responsibly in the administration of justice on the reservations. Too often, however, tribal courts have not acted judiciously.

And more important, Mr. Speaker, under present procedures we have no way of telling whether a tribal court has abused its powers because it is usually not possible for a defendant to ever raise a question in an appeal or in a habeas corpus proceeding.

The enactment of this bill would clearly set forth certain fundamental *limitations on the power of tribal courts in dealing with tribal members:*

It would prohibit double jeopardy;

It would provide for the privilege against self-incrimination;

It would require a speedy and public trial;

It would require that the accused be informed of the nature of the offense charged, that he be confronted by witnesses against him, and that he have compulsory process for obtaining witnesses in his own favor;

It would prohibit excessive bail, and would provide by statute for a maximum punishment by a tribal court of 6 months in jail or $500 fine; and

It would provide for imprisonment only after a jury is requested by the defendant. (emphasis added.)

*See also,* Remarks of Sen. Ervin, 113 Cong. Rec. 13,473 (May 23, 1967):

1. The historical development of a unique relationship between the Indian communities and the United States has resulted in a situation in which there exists, unfortunately, both the potentiality and the actuality of deprivation of individual rights by tribal governments.

2. Though evidence of the denial of substantive and political rights has been brought to the subcommittee's attention, it is apparent that *an Indian citizen's rights* are most seriously jeopardized by the tribal government's administration of justice. These denials occur, it is also apparent, not from malice or ill will, or from a desire to do injustice, but from the tribal judges' inexperience, lack of training, and unfamiliarity with the traditions and forms of the American legal system. (Emphasis added.)

8. This Memorandum was cited with approval in 78 I.D. 229, 230 (1971). While the Interior Department has subsequently withdrawn this Memorandum, it has not published any position inconsistent therewith. In any case, the Memorandum is strong evidence of the Department's longstanding policy in this area. *See* M. Price, Law and the American Indian 173 (1973).

9. *Accord,* W. Brophy & S. Aberle, The Indian—America's Unfinished Business 50 (1966); Newman, *Jurisdiction Over Indians and Indian Land in Washington,* 1 Studies in American Indian Law 232, 239 (R. Johnson *ed.* 1970); Note, *The Indian Bill of Rights and the Constitutional Status of Tribal Governments,* 82 Harv.L.Rev. 1343, 1356–57 (1969); *see* Comment, *The "Right of Tribal Self-Government" and Jurisdiction of Indian Affairs,* 1970 Utah L.Rev. 291, 298.

these two exceptions extend only to situations where the crime was committed by Indians is alone a strong indication that Congress considered the residual jurisdiction of tribal courts to be limited to such offenders.[10]

This inference is greatly strengthened by section 1153. That section provides an exception to the exception in section 1152 by providing that where an Indian commits, against the person or property of another Indian, one of several major listed crimes, exclusive jurisdiction for the offense lies in federal court. *Sam v. United States*, 385 F.2d 213, 214 (10th Cir. 1967); *see Felicia v. United States*, 495 F.2d 353, 354 (8th Cir.), *cert. denied*, 419 U.S. 849 (1974). It seems extremely anomalous that Congress would provide for exclusive jurisdiction in the federal courts for major offenses committed by Indians, but permit tribal courts to try non-Indians for those same major offenses.[11] The more reasonable inference, of course, is that Congress withdrew jurisdiction from the tribal courts to try major offenses only when these were committed by one Indian against another because it knew that tribal jurisdiction extended no further than this class of offenders.[12]

Section 1165 of title 18 prohibits unauthorized entry upon Indian land for the purpose of hunting or fishing. The legislative history of that provision indicates a clear congressional understanding that tribal jurisdiction does not extend to non-Indians. And it was precisely this lack of power by Indian tribes to punish non-Indians that formed the rationale for enactment of the section.

The problem confronting Indian tribes with sizable reservations is that the United States provides no protection against trespassers comparable to the protection it gives to Federal property as exemplified by title 18, United States Code, section 1863 [trespass on national forest lands]. Indian property owners should have the same protection as other property owners. For example, a private hunting club may keep nonmembers off its game lands or it may issue a permit for a fee. One who comes on such lands without permission may be prosecuted under State law but a non-Indian trespasser on an Indian reservation enjoys immunity. *This is by reason of the fact that Indian tribal law is enforcible against Indians only; not against non-Indians.*

. . . . .

**10.** I find the majority's explanation of why this section protects Indians from double jeopardy but not non-Indians unpersuasive. Majority opinion, note 1. Far from being a simple oversight, it is, I think, strong evidence that the prevalent assumption at that time on the part of Congress was that Indian courts simply were not entitled to try and punish non-Indians. Moreover, the fact that Congress failed to correct any such "oversight" for more than 100 years is indicative that the wording accurately reflects the congressional intent.

**11.** The Indian Civil Rights Act, 25 U.S.C. § 1302(7), limits the penalty that may be imposed by a tribal court to 6 months imprisonment and a $500 fine. Section 1153, however, considerably antedates the 1968 Act, tracing its origins to the Indian Appropriation Act of 1885, c. 341, § 9, 23 Stat. 385. *See People v. Kagama*, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886).

**12.** 18 U.S.C. § 1160 provides some additional support for the proposition that Congress never assumed that Indian tribunals could exercise jurisdiction over non-Indians. That section provides for compensation for Indian victims of

crimes committed by white men. In certain instances such compensation is to be paid by the United States treasury. The section provides, however, that no such compensation is to be paid where the victim "or any of the nation to which he belongs, have sought private revenge, or have attempted to obtain satisfaction by any force or violence." Although the passage discusses possible action by the Indian nation as a whole, no mention is made of the possibility of exacting restitution or retribution in tribal court. While of course this section is not directly applicable to the problem we are considering, I find it indicative of the congressional attitude toward the possibility that non-Indians might be subjected to the scrutiny of an Indian court. This section can be traced back to the Indian Trade and Intercourse Act of 1802, ch. 13, § 4, 2 Stat. 141, which contains the quoted language virtually verbatim. The fact that Congress has left this portion of the section unchanged while repeatedly amending other parts is indicative that failure to refer to the possibility of tribal court justice was not inadvertent.

*Non-Indians are not subject to the jurisdiction of Indian courts and cannot be tried in Indian courts on trespass charges.* Further, there are no Federal laws which can be invoked against trespassers.

.    .    .    .    .

The committee has considered this bill and believes that the legislation is meritorious. The legislation will give to the Indian tribes and to individual Indian owners certain rights that now exist as to others, and fills a gap in the present law for the protection of their property.

S.Rep.No.1686, 86th Cong., 2d Sess. 2–3 (1960) (emphasis added). *Accord,* Letter from Roger Ernst, Assistant Secretary of the Interior, to Senator Celler, Chairman of the Senate Judiciary Committee, Feb. 13, 1958, *id.* at 3, 4.

I am persuaded that Indian tribal courts were not intended to have jurisdiction over non-Indians. Although Congress has never explicitly so provided, it has repeatedly acted in accord with this premise. Unlike the majority, I would not require an express congressional withdrawal of jurisdiction. A presumption in favor of any inherent, general jurisdiction for tribal courts is wholly inconsistent with the juridical relations between the federal government and the Indian tribes that has existed for the past 100 years. Viewing tribal courts in their historical and cultural context, in light of the fact that virtually no white man appears to have been tried by an Indian tribunal in the past century, congressional silence on this point can hardly be viewed as assent.

Since I do not believe that Indian courts have jurisdiction over the appellant, I would not reach his claim that he would be denied due process were such a trial to take place. I would grant the writ of habeas corpus.