BABBITT FORD, INC., an Arizona
Corporation, Plaintiff,

v.

The NAVAJO INDIAN TRIBE, Through
Its Chairman, Peter MacDonald, et
al., Defendants.

GURLEY MOTOR COMPANY, a New
Mexico Corporation, Plaintiff,

v.

Peter MacDONALD, individually and in
his official capacity as Chairman of the
Navajo Tribal Council, et al., Defend-
ants.

Nos. CIV 80–686 PCT CAM, CIV
80–925 PHX CAM.

United States District Court,
D. Arizona.

July 14, 1981.

Gerald W. Nabours, Mangum, Wall, Stoops & Warden, Flagstaff, Ariz., for Babbitt Ford, Inc.

Alvin H. Shrago, Evans, Kitchel & Jenckes, Phoenix, Ariz., for Gurley Motor Co.

Williby E. Case, Jr., Katherine Ott, Vlassis & Ott, Phoenix, Ariz., for Navajo Indian Tribe, Peter McDonald, Navajo Tribal Courts, Nelson J. McCabe, Navajo Tribal Police, Wilbur Kellogg.

John A. MacKinnon, Elizabeth Bernstein, DNA--Peoples Legal Services, Inc., Tuba City, Ariz., for Tom Sellers and Lorraine Sellers, husband & wife; Barney Joe and Alice Joe, husband and wife.

T. W. Shumway, St. George, Utah, for amicus curiae.

## OPINION AND ORDER

MUECKE, Chief Judge.

Plaintiffs herein are automobile dealers. Plaintiff Babbitt Ford (Babbitt) is an Arizona corporation doing business in Flagstaff,

Arizona. Plaintiff Gurley Motor Company (Gurley) is a New Mexico Corporation doing business in Gallup, New Mexico.[1]

By virtue of their close proximity to the Navajo Indian Reservation, both plaintiffs enjoy a significant business from members of the Navajo Tribe. From time to time, plaintiffs' Navajo customers have defaulted on their obligations.[2] In such instances, plaintiffs have exercised their rights under state law and have peacefully repossessed their vehicles.

In 1968, the Navajo Tribal Council enacted 7 N.T.C. § 607, which provides as follows:

§ 607. Repossession of personal property

The personal property of Navajo Indians shall not be taken from land subject to the jurisdiction of the Navajo Tribe under the procedures of repossession except in strict compliance with the following:

(1) Written consent to remove the property from land subject to the jurisdiction of the Navajo Tribe shall be secured from the purchaser at the time repossession is sought. The written consent shall be retained by the creditor and exhibited to the Navajo Tribe upon proper demand.

(2) Where the Navajo refuses to sign said written consent to permit removal of the property from land subject to the jurisdiction of the Navajo Tribe, the property shall be removed only by order of a Tribal Court of the Navajo Tribe in an appropriate legal proceeding.

To enforce the above provision, the Tribal Council enacted §§ 608 and 609:

§ 608. Violations—Penalty

(a) Any nonmember of the Navajo Tribe, except persons authorized by Federal law to be present on Tribal land, found to be in wilful violation of 7 N.T.C. § 607 may be excluded from land subject to the jurisdiction of the Navajo Tribe in accordance with procedure set forth in 17 N.T.C. §§ 1903–1906.

(b) Any business whose employees are found to be in wilful violation of 7 N.T.C. § 607 may be denied the privilege of doing business on land subject to the jurisdiction of the Navajo Tribe.

(c) Any Indian who violates any provision of 7 N.T.C. § 607 shall be guilty of a crime, and upon conviction shall be punished by a fine of not more than $100.

§ 609. Civil Liability

Any person who violates 7 N.T.C. § 607 and any business whose employee violates such section is deemed to have breached the peace of the lands under the jurisdiction of the Navajo Tribe, and shall be civilly liable to the purchaser for any loss caused by the failure to comply with 7 N.T.C. §§ 607–609.

If the personal property repossessed is consumer goods (to wit: goods used or brought for use primarily for personal, family or household purposes), the purchaser has the right to recover in any event an amount not less than the credit service charge plus 10% of the principal amount of the debt or the time price differential plus 10% of the cash price.

Purchaser means the person who owes payment or other performance of an obligation secured by personal property, whether or not the purchaser owns or has rights in the personal property.

Plaintiffs argue that 7 N.T.C. § 607 *et seq.* constitutes an attempt by an Indian tribe to assert civil and criminal jurisdiction over a non-Indian and that, as such, these ordinances are invalid and unenforceable. Plaintiffs move for a declaratory judgment to this effect and further, for an order permanently enjoining defendants from attempting to enforce their ordinances.

1. Plaintiffs' complaints were filed separately. Since each raised similar issues of law, they were consolidated by Court Order on December 1, 1980.

2. Plaintiff Gurley alleges that it has repossessed 1,500 vehicles over the past six years. Plaintiff Babbitt alleges that it repossesses approximately ten vehicles per month within the boundaries of the Navajo Reservation.

## Present Status

On February 9, 1981, this Court held oral argument on the following motions: plaintiff Babbitt's motion for preliminary injunction (filed August 27, 1980), defendant Seller's and defendant Joe's motion to dismiss Babbitt's complaint (filed September 29, 1980), defendant Navajo Tribe's motion to dismiss Babbitt's complaint (filed October 7, 1980), and defendant Navajo Tribe's motion to dismiss plaintiff Gurley's complaint (filed January 9, 1981).

At the Court's suggestion, plaintiff Babbitt and the defendants agreed that Babbitt's motion for preliminary injunction could be treated as a request for a permanent injunction under Rule 65(a)(2), Federal Rules of Civil Procedure.

Following argument, the parties were given the opportunity to submit additional briefs. Several such briefs have been filed, and this matter is now ready for disposition.[3]

## Issues

The primary questions raised in defendants' motions to dismiss are:

(a) whether plaintiffs' claims are ripe for adjudication;

(b) whether plaintiffs' complaints allege a sufficient basis for federal jurisdiction;

(c) whether plaintiffs' claims are barred by sovereign immunity;

(d) whether plaintiffs' complaints state a claim upon which relief can be granted.

## Case or Controversy

It is undisputed that two of Babbitt's Navajo customers have obtained tribal court judgments against Babbitt pursuant to 7 N.T.C. § 609. Although plaintiff Gurley cannot say as much, it does allege that "over the last two months, a number of Indians, whose motor vehicles have been repossessed, have threatened to initiate civil litigation against plaintiff in tribal court." Gurley Complaint at ¶ 19.

The Tribe argues that Gurley has failed to state a case or controversy for the reason that Gurley has not been the subject of a § 609 judgment. Babbitt's complaint is alleged to be deficient for the reason that the Indians who have obtained § 609 judgments have not successfully executed them. Neither of the Tribe's contentions can be sustained.

In order to satisfy the case or controversy requirement imposed by Art. III of the Constitution, plaintiffs are under a burden to

" 'allege some threatened or actual injury resulting from the putatively illegal action . . . .' *Linda R. S. v. Richard D.*, 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). There must be a 'personal stake in the outcome' such as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions. *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962). . . . It must be alleged that the plaintiff 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged . . . conduct. *Massachusetts v. Mellon*, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923). The injury or threat of injury must be both 'real and immediate,' not 'conjectural' or hypothetical." *Golden v. Zwickler*, 394 U.S. 103, 109–110, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969).

*O'Shea v. Littleton*, 414 U.S. 488, 491, 494, 94 S.Ct. 669, 673, 675, 38 L.Ed.2d 674 (1974).

From the foregoing language, it is apparent that Babbitt's allegations that it has suffered two § 609 judgments satisfy Article III. Babbitt need not allege actual and direct injury in order to state a case or controversy. It is enough that injury be imminent. *See e. g. Babbitt v. United Farm Workers*, 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979); *Pennsylvania v. West Virginia*, 262 U.S. 553, 43 S.Ct. 658, 67 L.Ed. 1117 (1923).

---

**3.** The United States has filed a brief as Amicus Curiae.

■ Since Gurley has been able to avoid § 609 litigation, this Court's conclusions as to Babbitt do not necessarily end the inquiry. Nevertheless, Gurley's complaint cannot be viewed in a vacuum. In light of the Babbitt judgments, for the Tribe to argue that Babbitt's co-plaintiff is not threatened with similar treatment seems frivolous. Moreover, Gurley has alleged that it has been subjected to harassment by defendant Tribe and that tribal members have threatened litigation. Viewed in this context, Gurley stands in substantially the same position as Babbitt.

### Subject Matter Jurisdiction

The Ninth Circuit's most recent analysis of federal jurisdiction over disputes between Indians and non-Indians appeared in *Trans-Canada Enterprises Ltd. v. Muckleshoot Indian Tribe*, 634 F.2d 474 (1980). At issue in *Trans-Canada* was the Tribe's ability to enforce a business licensing ordinance against certain non-Indians by means of a civil enforcement action in Tribal Court. In response to the Tribe's attempts, the non-Indians brought suit in federal district court seeking injunctive and declaratory relief. The Ninth Circuit refused assistance, holding that plaintiffs had not carried their burden of establishing federal jurisdiction.

■ *Trans-Canada* is relevant to the present case in that it disposes of two of plaintiffs' jurisdictional contentions: federal question jurisdiction under *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946), and statutory jurisdiction under the Indian Civil Rights Act, 25 U.S.C. §§ 1301–1303.[4]

Unlike plaintiffs in *Trans-Canada*, however, plaintiffs in this case have alleged jurisdiction pursuant to 28 U.S.C. § 1331, the general federal question statute. The *Trans-Canada* Court specifically withheld comment on whether § 1331 would have vested the district court with jurisdiction:

> We ... decline to rule on the issue whether § 1331 is an appropriate jurisdictional vehicle in cases wherein Indian tribes or their officers are defendants. However, we instruct the district court to grant leave to amend upon remand.

*Trans-Canada, supra* at n. 4. Given plaintiffs' assertion of § 1331 jurisdiction, this Court is required to answer the question that *Trans-Canada* did not reach.

### 28 U.S.C. § 1331

It has long been established that "Indian tribes are no longer 'possessed of the full attributes of sovereignty.'" *United States v. Wheeler*, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978).

At the core of plaintiffs' complaints is a question that has frequently been the subject of federal disputes, namely, the extent to which an Indian tribe can assert jurisdiction over non-Indians. *See e. g., Montana v. United States*, —— U.S. ——, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); *Washington v. Confederated Tribes of Colville*, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980); *United States v. Wheeler, supra*, 98 S.Ct. at 1079; *Oliphant v.*

---

**4.** The Court rejected Plaintiffs' claim under the ICRA, citing *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978), which held that the sole federal remedy for an alleged violation of the Act is application for federal habeas corpus relief under 25 U.S.C. § 1303. Plaintiffs in the present case argue that *Santa Clara* is inapplicable where, as here, the plaintiff is a non-Indian. *See Dry Creek Lodge, Inc. v. Arapahoe and Shoshone Tribes*, 623 F.2d 682 (10th Cir. 1980). While plaintiffs' argument is not without logic, *Trans-Canada* has taken a different position, and this Court finds *Trans-Canada* controlling.

The *Trans-Canada* Court rejected plaintiffs' assertion of jurisdiction under *Bell v. Hood, supra*, with the following observation:

> The district court's finding of federal question jurisdiction was based in part upon its assumption that the due process clauses of the fifth and fourteenth amendments were applicable to the Tribe's exercise of its police power over Trans-Canada's proposed construction. Constitutional guarantees, however, are not applicable to the exercise of governmental powers by an Indian tribe except to the extent that they are made explicitly binding by the Constitution or are imposed by Congress.

634 F.2d at 476–477. This Court reads *Trans-Canada* to preclude a finding that the Navajo Tribe has violated plaintiffs' constitutional rights.

*Suquamish Indian Tribe*, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978); *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959).

In cases involving the exercise of tribal power over non-Indians, the Courts have first examined the tribe's treaty to see whether the power in question has been granted or relinquished. *See Montana v. United States, supra; Oliphant v. Suquamish Indian Tribe, supra.* Next, the Courts have looked to federal statutes to determine whether Congress, with its plenary control in this area, has affected tribal power. *See Washington v. Confederated Tribes, supra* 100 S.Ct. at 2082. Absent a clear answer from these sources, the Courts have examined the area of inherent tribal sovereignty, the boundaries of which are a matter of federal common law. *See e. g. Montana v. United States, supra; Oliphant v. Suquamish Indian Tribe, supra; Washington v. Confederated Tribes, supra.*

That federal question jurisdiction under 28 U.S.C. § 1331 can be based on federal common law is well-settled. *See Illinois v. City of Milwaukee, Wisconsin*, 406 U.S. 91, 99–100, 92 S.Ct. 1385, 1390–91, 31 L.Ed.2d 712 (1972).

Under the present circumstances, this Court would find that the question whether the Navajo Tribe has retained the inherent sovereign authority to exercise jurisdiction over plaintiffs is a sufficient federal question upon which to base § 1331 jurisdiction.[5]

### Sovereign Immunity

Plaintiff Gurley Motor has named the following defendants: the Chairman of the Navajo Tribal Council, the Director of the Division of Public Safety of the Navajo Tribe, three judges of the Navajo Tribal Court, and a judge of the Navajo Court of Appeals. All are sued in their individual as well as their official capacities. Plaintiff Babbitt Ford has taken a slightly different approach. Babbitt has sued the Navajo Indian Tribe, through its Chairman; the Navajo Tribal Court, through its Chief Justice; the Navajo Tribal Police, through the Superintendent; and two non-governmental married couples—the Sellers and the Joes.

All of the above defendants, except the Sellers and the Joes, move to dismiss on the basis of sovereign immunity.

There is no question that Indian tribes enjoy commonlaw sovereign immunity. *See e. g. Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 58, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978). Although the boundaries of this immunity are subject to Congress' plenary control, they cannot be pierced without Congressional authorization, *Santa Clara Pueblo, supra* at 58, 98 S.Ct. at 1677, or tribal consent. *See Merrion v. Jicarilla Apache Tribe*, 617 F.2d 537, 540 (10th Cir.), *cert. granted*, 449 U.S. 820, 101 S.Ct. 71, 66 L.Ed.2d 21 (1980).

Since plaintiffs do not argue waiver, the sole question is whether sovereign immunity bars plaintiffs from suing the Tribe indirectly through its officers.

It has long been settled that a plaintiff cannot avoid the doctrine of sovereign immunity by the simple expedient of naming an officer-defendant rather than the sovereign entity. *See Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). In all cases, the "crucial question is whether the relief sought in a suit nominally addressed to the officer is relief against the sovereign." *Id.* at 687, 69 S.Ct. at 1460. Where, as here, the relief sought is an injunction,

the question is . . . whether by obtaining relief against the officer, relief will not,

---

5. The parties have argued a number of other bases of federal jurisdiction. This Court's ruling that § 1331 is appropriate, however, makes consideration of these additional issues unnecessary.

While no Circuit Court has expressly ruled on the § 1331 issue, this Court would point to a recent decision by the District Court for the District of New Mexico, *UNC Resources, Inc. v. Kee Joe Benally*, 514 F.Supp. 358 (1981), wherein it was determined that the question of "retained tribal sovereignty" was sufficient to find jurisdiction under § 1331.

in effect be obtained against the sovereign. For the sovereign can only act through agents . . . .

*Id.* at 689, 69 S.Ct. at 1460.

■ Under the circumstances before this Court, it cannot be seriously argued that an injunction against the officer-defendants would not also work to bar the sovereign. The issue, therefore, is whether plaintiffs can fit their case into a recognized exception to the doctrine of sovereign immunity.

■ In *Larson v. United States, supra,* the Court discussed two situations in which officers of a sovereign may be restrained from taking an official (as distinguished from a personal) act. *First*: an officer may be restrained when his actions are beyond the sovereign's statutorily imposed limitations. 337 U.S. at 689, 69 S.Ct. at 1461. *Second*: an officer may be restrained when the statute conferring power upon the officer to take action in the sovereign's name is unconstitutional. *Id.* at 690, 69 S.Ct. at 1461. The *Larson* Court emphasized that in both situations, "the conduct against which specific relief is sought is beyond the officer's powers and is, therefore, not the conduct of the sovereign." *Id.* at 690, 69 S.Ct. at 1461–62.

As noted by the Tribe, the problem before this Court does not fit into either of the categories discussed in *Larson*. Neither plaintiff has cited a Navajo statute outside which defendant officers are alleged to have acted. Moreover, although plaintiffs have alleged constitutional violations, the Ninth Circuit has ruled that

Constitutional guarantees . . . are not applicable to the exercise of governmental powers by an Indian tribe, except to the extent that they are made explicitly binding by the Constitution or are imposed by Congress.

*Trans-Canada Enterprises v. Muckleshoot, supra* at 476–77.

In essence, the Tribe argues that *Larson's* list of exceptions to sovereign immunity was exhaustive, and that plaintiffs' inability to call upon the *Larson* exceptions is a *per se* bar to plaintiffs' actions.

The flaw in the Tribe's argument is that *Larson* was addressing *federal*, and not tribal, sovereignty. As indicated above, since an officer's act which exceeds the limits of sovereign power cannot be the act of the sovereign, the key to the immunity issue is power. For this reason, *Larson's* list of exceptions would apply to the Tribe only if the boundaries of tribal power and the boundaries of federal power were alike. This is simply not the case. *See generally, Montana v. United States, supra* —— U.S. at ——, 101 S.Ct. at 1257–1259.

■ Consistent with *Larson,* federal sovereignty is limited only by the Constitution of the United States. Tribal sovereignty, on the other hand, is limited by a number of sources. Tribal sovereignty is limited by those portions of the Constitution that are "explicitly binding," *Trans-Canada v. Muckleshoot, supra* at 476–77; it is limited by Congress' plenary control, *see Santa Clara Pueblo v. Martinez, supra* 436 U.S. at 58, 98 S.Ct. at 1677; and it is limited by inconsistent treaty provisions. *See United States v. Wheeler, supra* 435 U.S. at 323, 98 S.Ct. at 1086. Finally, tribal sovereignty is limited by the "overriding interests of the National Government." *Washington v. Confederated Tribes, supra* 100 S.Ct. at 2081. *See also, Oliphant v. Suquamish Indian Tribe, supra; Merrion v. Jicarilla Apache Tribe,* 617 F.2d 541.

As this Court stated earlier, the core of plaintiffs' complaints is the extent to which an Indian tribe can assert jurisdiction over non-Indians. It is this exact question that controls the issue of sovereign immunity. If, under the circumstances, the officer-defendant's acts are within the limits of Tribal sovereign power, then plaintiffs' action is barred by sovereign immunity. If the acts are excessive, then plaintiffs will prevail.

Given that the merits of plaintiffs' case and the question of sovereign immunity are hopelessly intertwined, this Court will treat both issues together in its discussion of the merits.

*Failure to State a Claim*

The merits of this action raise two basic issues: *first,* whether the Navajo Tribe relinquished the power to assert civil jurisdiction over non-Indians when it entered into certain treaties with the federal government, and *second* if not, whether the Tribe is deprived of that power by any other source.

## TREATY PROVISIONS

Plaintiffs argue that even if the Tribe was at one time possessed of the sovereign power to assert civil jurisdiction over non-Indians, it relinquished that right by entering into the Treaties of 1850 and 1868.

The portions of the Treaties emphasized by the parties are as follows:

### Treaty of 1850

(Article II) . . . all cases of aggression against said Navajos by citizens or others of the United States . . . shall be referred to the government of said States . . .

(Article III) The Government of the said States having the sole and exclusive right of regulating the trade and intercourse with the said Navajos . . .

(Article VI) Should any citizen of the United States . . . maltreat any Navajo Indian . . . he shall be subjected to all the penalties provided by law . . . of the said States.

(Article VIII) The people of the United States of America shall have free and safe passage through the territory . . .

### Treaty of 1868

If bad men among the White's or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will, upon proof made to the agent and forwarded to the Commissioner of Indian Affairs at Washington City, proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and also to reimburse the injured persons for the loss sustained.

If bad men among the Indians shall commit a wrong or depredation upon the person or property of any one, *white,* black, or *Indian,* subject to the authority of the United States and at peace therewith, the Navajo Tribe agree that they will, on proof made to their agent, and on notice by him, *deliver up the wrongdoer* to the United States, to be tried and punished according to its laws; and in case they wilfully refuse so to do, the person injured shall be reimbursed for his loss from the annuities or other moneys due or to become due to them under this treaty, or any others that may be made with the United States. And the President may prescribe such rules and regulations for ascertaining damages under this article as in his judgment may be proper; but no such damage shall be adjusted and paid until examined and passed upon by the Commissioner of Indian Affairs, and no one sustaining loss whilst violating, or because of his violating, the provisions of this treaty or the laws of the United States, shall be reimbursed therefor.

(Emphasis added).

Before analyzing the above provisions, it is important to note certain established principles of treaty interpretation.

■■■■■ Significantly, a tribe is not limited to those powers granted it by treaty. Rather, it retains all aspects of sovereignty that have not been removed by Congress or by the tribe's dependent status. *See United States v. Wheeler, supra* 435 U.S. at 323, 98 S.Ct. at 1086. Moreover, the Courts will not acknowledge a Congressional intent to restrict tribal sovereignty unless the intent is "clear." *Santa Clara Pueblo v. Martinez,* 436 U.S. at 60, 72, 98 S.Ct. at 1678, 1684.

■■■ In determining what was intended by the parties to a treaty, the language is to be interpreted as it would naturally be understood by the tribe. *See Jones v. Meehan,* 175 U.S. 1, 10–11, 20 S.Ct. 1, 5, 44 L.Ed. 49 (1899). In addition, it is accepted that any doubtful or ambiguous expressions are to be resolved in favor of the Indians. *See McClanahan v. State Tax Commission of Arizona,* 411 U.S. 164, 174, 93 S.Ct. 1257,

1263, 36 L.Ed.2d 129 (1973); *Choate v. Trapp*, 224 U.S. 665, 675, 32 S.Ct. 565, 569, 56 L.Ed. 941 (1912).

■ Neither plaintiffs nor the Tribe have unearthed any legislative history regarding the treaty provisions at issue. From the language alone, however, and applying the principles set forth above, this Court would reject an interpretation that would divest the Navajo Tribe of the sovereign power to subject non-Indians to its civil jurisdiction.

While there is much in these treaties to suggest that the United States is possessed of criminal, and possibly civil, jurisdiction over reservation incidents, there is nothing that would oust the Tribe from exercising concurrent civil jurisdiction. Both treaties promise that the United States will assist the Indians in righting "wrongs" against the Indians. Neither, however, clearly removes the authority of the Indians to deal with these "wrongs."

Plaintiffs place primary reliance on the "bad men among the Whites" paragraph of the Treaty of 1868, and its promise that once the offender is turned over, the government will "cause the offender to be arrested and punished according to the laws of the United States *and also to reimburse the injured persons for the loss sustained.*" (Emphasis added). While this provision contemplates that the injured Indian can seek reimbursement from the *government, see Hebah v. United States*, 428 F.2d 1334 (Ct.Cl.1970), it in no way suggests that the Indians are thereby deprived of the power to seek recovery from the wrongdoer himself. Consistent with the principles of interpretation set forth above, this Court would interpret the "reimbursement" provision to give the Indians an additional avenue for recovery—not to deprive them of anything.[6]

**6.** If this Court were to read the "bad men among the Whites" paragraph to oust the Navajos of civil jurisdiction over non-Indians, it would have to give a similar reading to the next paragraph, which covers "bad men among the Indians." Such an interpretation, however, would fly in the face of *Williams v. Lee*, 358

## INHERENT SOVEREIGNTY

In *Oliphant v. Suquamish Indian Tribe, supra,* the United States Supreme Court rejected the argument that an Indian tribe's inherent sovereignty permits it to assert *criminal* jurisdiction over non-Indians who have violated tribal law. In so doing, the Court looked to previous legislative activity, treaty provisions, and inherent sovereignty itself.

■ The Court ruled that while Congress never expressly forbade Indian tribes to impose criminal penalties on non-Indians, "Congress consistently believed this to be the necessary result of its repeated legislative actions." 435 U.S. at 204, 98 S.Ct. at 1019. More importantly,

> even ignoring the treaty provisions and congressional policy, Indians do not have criminal jurisdiction over non-Indians absent affirmative delegation of such power by Congress. Indian tribes do retain elements of "quasi-sovereign" authority after ceding their lands to the United States and announcing their dependence on the Federal Government .... But the tribes' retained powers are not such that they are limited only by specific restrictions in treaties or congressional enactments.

*Id.* at 208, 98 S.Ct. at 1021. (Emphasis added). According to the Court, Indian sovereignty is also limited in that tribes cannot exercise powers that are "*inconsistent with their status.*" *Id.,* citing *Oliphant v. Schlie,* 544 F.2d at 1007, 1009 (9th Cir. 1976). (Emphasis in original).

Conflicting with the Indians' interest in protecting their own territory, is the federal government's interest in protecting its citizens from "unwarranted intrusions on their personal liberty." 435 U.S. at 209–212, 98 S.Ct. at 1021. Stressing that upon incorporation into the United States, the "Indian tribes thereby come under the territorial

U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), discussed *infra,* which gives the Tribe exclusive jurisdiction over civil actions involving non-Indian plaintiffs and Indian "bad men" and *United States v. Wheeler, supra,* which permits the Indians to subject their own people to criminal prosecution.

428

sovereignty of the United States and their exercise of separate [sovereign] power is constrained so as not to conflict with the interests of this overriding sovereignty", *Id.* at 209, 98 S.Ct. at 1021, the Court ruled that "by submitting to the overriding sovereignty of the United States, Indian tribes therefore necessarily [gave] up their power to try non-Indian citizens of the United States except in a manner acceptable to Congress." *Id.* at 210, 98 S.Ct. at 1021.

Plaintiffs argue that *Oliphant* demands that the Navajo Tribe be without jurisdiction to enforce its civil law. While this Court would agree that tribal jurisdiction is not equal to that possessed by the States, it would decline to read *Oliphant* for the proposition that non-Indians, especially those who willingly come upon the reservation, cannot be subjected to the tribe's civil authority. *Oliphant* was expressly limited to the question of *criminal* jurisdiction. Neither the relationship between civil and criminal law nor the Supreme Court's decisions in the area of tribal civil jurisdiction compel the conclusion that *Oliphant* should be completely dispositive of the question before this Court.

*Oliphant*'s finding that "unwarranted intrusions on [United States's citizens'] personal property" constituted an overriding national interest would also apply to unwarranted deprivation of property. *See Merrion v. Jicarilla Apache Tribe, supra,* which found a "national, if not a sovereign interest in preventing deprivations of property without due process." 617 F.2d at 542. Unlike a criminal fine, however, which serves to punish the offender, a major purpose of civil law is to *compensate* the victim. Since compensation, unlike punishment, is limited by the amount of damage suffered, *Oliphant*'s fears of "unwarranted intrusions" are less justified in civil litigation than in criminal prosecution.

From the Tribe's standpoint, it is also significant that civil compensation works to deter the behavior for which compensation was ordered. Thus, prohibiting the Tribe from enforcing its civil law would impair the Tribe's ability to protect the health and welfare of its members. *See Montana v. United States, supra* — U.S. at —— ——, 101 S.Ct. at 1258–1259.

The practical effect of *Oliphant* in the criminal area was on *who* would punish, not on whether the punishment would occur. In most cases, the non-Indian can be turned over to the appropriate authorities for punishment under the government's laws.

In civil litigation, on the other hand, there is no state or federal system to initiate prosecution. The victim, if he is to be compensated, must do it himself.

█ The whole basis for our notions of personal jurisdiction is grounded on the principle that the forum where the wrong was committed—where the injury was suffered, is the appropriate place for a plaintiff to sue. Application of *Oliphant* to civil jurisdiction requires the Indian plaintiff to attempt litigation on the defendant's homebase; a forum that might be wholly foreign to the Indian.

In addition to the conceptual differences between civil and criminal actions, the present state of the law does not permit an *Oliphant*-type ruling that Indian tribes are completely without civil jurisdiction over non-Indians. Unlike criminal jurisdiction, the Supreme Court has regularly permitted Indian tribes to assert forms of non-punitive civil jurisdiction over non-Indians. *See e. g., Montana v. United States, supra; Washington v. Confederated Tribes of Colville, supra; Williams v. Lee, supra.*

The most celebrated case in this area is the Supreme Court's 1959 decision of *Williams v. Lee, supra.* In that case, plaintiff, the non-Indian proprietor of a general store on the Navajo Reservation, sued an Indian customer in state court to collect for goods that plaintiff had sold on credit. The Supreme Court held that the *state court* was without jurisdiction to hear the matter and that the *only* forum in which plaintiff could sue was the Navajo Tribal Court.

Although *Williams v. Lee* involved a non-Indian plaintiff, and is therefore not direct-

ly on-point, the case establishes some highly-significant principles.

At a minimum, the case establishes that, where plaintiff is a non-Indian, and where "to allow the exercise of state jurisdiction . . . would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves," *id.* 358 U.S. at 223, 79 S.Ct. at 272, Indian tribes have retained the sovereign authority to assert jurisdiction over non-Indians. But the case goes further than this. Under the above facts, the sovereign authority of the Tribe is so great that it can actually usurp the sovereign authority of a state of the United States.

In this case, the Tribe is not attempting to prevent the State from exercising jurisdiction. It is merely asking that its jurisdiction be concurrent. Simply stated, the central issue in this case is whether the Tribe's sovereign power, recognized in *Williams v. Lee*, applies when plaintiff is an Indian who wishes to proceed in Tribal Court.

Plaintiffs' primary argument is that *Williams v. Lee* was based on a consent theory. As in *Oliphant v. Suquamish*, the non-Indian defendant in this case is being dragged unwillingly into a foreign forum which may or may not accord him the rights to which he would be entitled in a court of the United States.

The difficulty with plaintiffs' argument is that subsequent Supreme Court decisions have not completely limited the rationale of *Williams v. Lee* to cases in which the plaintiff was a non-Indian. While it has never ruled on the exact question before this Court, the Supreme Court has analyzed the problem in the areas of taxation and hunting regulation.

In *Washington v. Confederated Tribes of Colville Indian Reservation, supra,* the question concerned the Tribe's power to extract a tax from a non-Indian purchaser of cigarettes. The Court rejected the argument that the Tribe was without such power:

The power to tax transactions occurring on trust lands and significantly involving a tribe or its members is a fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law *or necessary implication of their dependent status.*

*Id.* 100 S.Ct. at 2080–81. (Emphasis added).

The Court noted that both the executive branch and the federal courts have consistently recognized tribal power to tax non-Indians entering the reservation to engage in economic activities. Moreover, the Court stated that in cases where the tribe has a significant interest in the subject matter, this power

was very probably one of the tribal powers under "existing law" confirmed by § 16 of the Indian Reorganization Act of 1934, 48 Stat. 987, 25 U.S.C. § 476. In these respects the present cases differ sharply from *Oliphant v. Suquamish Indian Tribe* . . . , in which we stressed the shared assumptions of the Executive, Judicial and Legislative Departments that Indian tribes could not exercise criminal jurisdiction over non-Indians.

*Id.* 100 S.Ct. at 2081.

The Court went on to make the following significant observations:

Tribal powers are not implicitly divested by virtue of the Tribes' dependent status. This Court has found such a divestiture in cases where the exercise of tribal sovereignty would be inconsistent with the *overriding interests of the National Government,* as when the Tribes seek to engage in foreign relations, alienate their lands to non-Indians without federal consent, or *prosecute non-Indians in tribal courts which do not accord the full protections of the Bill of Rights. . . .* In the present case, we can see no overriding federal interest that would necessarily be frustrated by the tribal taxation. And even if the State's interests were implicated by the tribal taxes, a question we need not decide, it must be remembered that *tribal sovereignty is dependent on*

*and subordinate to only the Federal Government, not the States.*
*Id.*[7]

In *United States v. Montana*, 604 F.2d 1162 (9th Cir. 1979), the Ninth Circuit established that a Tribe's civil authority over non-Indians extended to the power to regulate hunting and fishing on the reservation. Quoting its prior ruling in *Quechan Tribe of Indians v. Rowe*, 531 F.2d 408, 411 (9th Cir. 1976), the Court held that the Tribe retained the

> rights to determine who may enter the reservation to hunt or fish; to define the conditions upon which they may enter; to prescribe rules of conduct; to expel those who enter the reservation without proper authority or those who violate tribal, state or federal laws; to refer those who violate state or federal laws to state or federal officials; and to designate officials responsible for effectuating the foregoing.

604 F.2d at 1170.

*Montana* also involved the degree to which the Tribe could regulate hunting and fishing on fee-patent lands, located within the boundaries of the Reservation, which had been sold by Indians to non-Indians. With respect to this issue, the Ninth Circuit held that although the Tribe could not prohibit non-Indians from hunting in these areas, it could engage in regulation which was "reasonable, nondiscriminatory, and consist-

ent with sound principles of conversation."
*Id.* at 1172.

The Supreme Court granted certiorari and summarily affirmed the Ninth Circuit's conclusion as to the power of Indians to regulate non-Indians *on the reservation. See Montana v. United States,* —— U.S. ——, ——, 101 S.Ct. 1245, 1254, 67 L.Ed.2d 493 (1981). It reversed, however, as to the power to control activity on fee-patent lands. In so doing, the Court made the following observations as to the power of Indians to assert civil jurisdiction over non-Indians on the reservation:

The Court emphasized that while tribes have retained the sovereign power to regulate their own affairs, the

> exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express Congressional delegation.

—— U.S. at ——, 101 S.Ct. at 1257. According to the Court, it was this principle which was applied to *Oliphant*:

> Though *Oliphant* only determined inherent tribal authority in criminal matters, the principles on which it relied support the *general* proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe. *To be sure, Indian*

---

7. Also involving the sovereign taxing authority is the Tenth Circuit's decision of *Merrion v. Jicarilla Apache Tribe*, 617 F.2d 537 (10th Cir. 1980), which has been recently argued before the Supreme Court. In that case, the Court of Appeals upheld the right of the Apache Tribe to tax non-Indian lessees who produced oil and gas from within the reservation.

The *Merrion* Court distinguished *Oliphant v. Suquamish, supra,* by aligning it with those cases in which the Supreme Court had found the Indians' exercise of sovereign power to be "inconsistent with the superior interests of the United States as a sovereign nation." 617 F.2d at 541. *Oliphant*'s ruling that Indians were without power to exercise criminal jurisdiction over non-Indians was seen to rest on the conclusion that

> the power of the tribes to restrict the personal liberty of United States citizens conflicts with the federal government's overriding in-

terest in protecting its citizens "from unwarranted intrusions on their personal liberty." *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 210, 98 S.Ct. 1011, 1021, 55 L.Ed.2d 209. *Id.* at 541.

Although the *Merrion* Court did find a "national, if not sovereign interest in preventing deprivations of property without due process ...," it also found that "in the context of taxing, [due process] is implicated only in the extremely rare case ...." *Id.* at 542.

The Court rejected the notion that *United States v. Wheeler, supra,* and *Oliphant v. Suquamish, supra,* stand for the proposition that "Indians are without inherent powers over any nonmembers of their tribe." *Id.* Instead, citing such decisions as *Williams v. Lee, supra,* the Court was persuaded by "Supreme Court decisions to the effect that the tribe's retained powers have at least some elements of territoriality." *Id.*

*tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxations, licensing, or other means, the activities of non-members who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements....* A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation *when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.*

*Id.* at —— – ——, 101 S.Ct. at 1258. (Emphasis added).

 The above-referenced cases lead this Court to conclude that the rule of *Williams v. Lee* is not limited to situations in which the non-Indian is a plaintiff. They also suggest, however, that the ability of a tribe to exercise civil jurisdiction over non-Indian defendants has two limitations.

*First: Montana v. United States, supra,* appears to impose the requirement that the dispute arise out of a "consensual relationship with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements" or that the conduct of the non-Indian defendant "threatens or has some direct effect on the political integrity, the economic security or the health or welfare of the tribe." —— U.S. at —— – ——, 101 S.Ct. at 1258. Such a limitation requires more in the way of minimum contacts than would be sufficient for the citizen of one state to assert personal jurisdiction over the citizen of another state. *See e. g. Worldwide Volkswagen,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).[8]

*Second*: several Supreme Court decisions have required that any assertion of jurisdiction by an Indian tribe be examined to determine whether it would be "inconsist-

ent with the overriding interests of the National Government." *Washington v. Confederated Tribes of Colville, supra* 100 S.Ct. at 2081. *See also Montana v. United States, supra; Oliphant v. Suquamish, supra.*

This Court has little difficulty in holding that the first part of the above test is met. At least where the dealer is aware of his customer's residence at the time of the sale (and it would be hard to imagine a credit sale where this is not the case), there is a "consensual relationship with the tribe or its members." This is no less the case with the dealer's decision, upon default, to go onto the reservation to repossess the offending vehicle.

In addition to the consensual nature of plaintiffs' relationship with the Tribe, it is also apparent that unlawful repossession "threatens or has some effect on the political integrity, the economic security or the health or welfare of the tribe." *Montana, supra* —— U.S. at —— – ——, 101 S.Ct. at 1258. The Tribe has a real interest in discouraging self-help repossessions. Not only does § 607 *et seq.* reduce the possibility that Indians will be wrongfully deprived of their property, it was enacted for the express purpose of preventing "breach of the peace." *See* § 609.

The real question in this case is whether the Tribe's assertion of civil jurisdiction, under these circumstances, is "inconsistent with the overriding interests of the National Government."

As previously indicated, *Oliphant*'s conclusions as to the assertion of criminal jurisdiction were prompted by a desire to protect United States' citizens from "unwarranted intrusions on their personal liberty." 435 U.S. at 210, 98 S.Ct. at 1021. As also noted, "unwarranted" intrusions are more likely when the purpose is to punish than when the purpose is to compensate.

---

**8.** This limitation, for example, would distinguish Judge Bratton's recent decision in *UNC Resources, Inc. v. Benally,* 514 F.Supp. 358 (1981), wherein the Court took the position that the Navajo Tribe could not assert civil jurisdiction over a defendant who's operations outside the reservation inadvertently caused contamination of reservation water.

For these reasons, the Court would distinguish between assertions of civil jurisdiction which are punitive and those which attempt to make the victim whole. The Court would hold that insofar as they are compensatory, tribal assertions of civil jurisdiction over non-Indians do not conflict with an overriding national interest. Attempts to punish, however, are prohibited.

The Court will now turn to the ordinances at issue to determine whether they fall within the above guidelines.

### Nature of Statutes Involved

Sections 608 and 609 set forth three penalties for non-Indians who violate § 607's repossession procedure. Section 608(a) permits the Tribe to exclude violators from land subject to the jurisdiction of the Navajo Tribe; section 608(b) permits the Tribe to deny violators the privilege of doing business on the reservation; and section 609 permits an Indian from whom consumer goods were repossessed to sue the violator in Tribal Court for damages. In the event § 609 is applicable, the injured party can recover

> in any event an amount not less than the credit service charge plus 10% of the principal amount of the debt or the time price differential plus 10% of the cash price.

While the parties discuss all three of the above provisions, their complaints are sufficient only as to § 609, the civil liability section.[9] As previously stated, Gurley alleges that § 609 suits against it are imminent; Babbitt alleges that they have actually occurred. On November 28, 1979, Tom and Lorraine Sellers obtained a judgment against Babbitt for $476.65. On March 24, 1980, Barney and Alice Joe obtained a judgment for $4,446.75. In each case, Babbitt admits that it failed to follow the repossession procedure of § 607.

Given that the issue is compensation, the liquidated damages provision of § 609, quoted above, is especially significant. This provision allows the Indian to recover the specified amount regardless of whether he proves damages. All he must do is prove that § 607 has been violated.

Liquidated damage provisions are not *per se* penal. It is widely recognized that they "serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable . . . ." *Rex Trailer Co. v. United States*, 350 U.S. 148, 153, 76 S.Ct. 219, 222, 100 L.Ed. 149 (1956). *See also, Brady v. Daly*, 175 U.S. 148, 20 S.Ct. 62, 44 L.Ed. 109 (1899). Liquidated damage provisions become penal only when, compared to the wrong to which they are directed, they are overly-generous. *Cf. In re Plywood Co. of Pennsylvania*, 425 F.2d 151, 155 (3d Cir. 1970).

Moreover, the validity of the provision in any given case is not determined with respect to the damages at hand; it is determined with respect to the reasonableness of the forecast. *Id.*

The Court's primary objection to the liquidated damages provision of § 607 is that it applies identically to both justified and unjustified repossessions.

> See *Quechan Tribe of Indians v. Rowe*, 531 F.2d 408 (9th Cir. 1976).
> While Gurley has not actually been banned from the Reservation, it argues that if the exclusion provisions were applied to prevent auto dealers from repossessing, such action would constitute a "forfeiture" within the meaning of *Quechan v. Rowe, supra*. The problem with Gurley's argument is that even if Gurley stood in imminent danger of having the exclusion provision applied to it, there is no reason to believe that the provision would be applied so as to prevent repossessions that complied with § 607. Gurley's argument is simply premature. See e. g. *O'Shea v. Littleton*, 414 U.S. at 494, 94 S.Ct. at 675.

---

**9.** In response to Babbitt's motion for preliminary injunction, the Sellers and the Joes allege that on March 24, 1980, Babbitt was denied the privilege of doing business on the Reservation and permanently excluded therefrom (with the exception that Babbitt is still authorized to seek relief or defend claims in Tribal Court and can still travel state or federal highways for purposes other than doing business.)

Since Babbitt has neither raised these facts, nor contested the Tribe's ability to exclude, it is not necessary for the Court to discuss this aspect of Tribal power. It is sufficient to note that the Ninth Circuit has recognized the power of the Navajo Tribe to exclude persons from the Reservation for infractions of Tribal law.

Where repossession is unjustified by the parties' contract and the law applicable thereto, the nature and quantity of the Indian's loss is sufficient to sustain the ordinance. In this situation, it is presumable that the Tribal Court would have refused to permit the repossession. Therefore, as a direct consequence of the dealer's failure to comply with § 607, the Indian has been deprived of his property—a vehicle to which he was rightfully entitled. In light of the seriousness of the trespass and the difficulty in ascertaining its consequences, this Court cannot say that the damages provision of § 609 is penal. Rather, it is an attempt to compensate the Indian for a substantial loss. In accordance with the principles previously discussed, this is within the Tribe's lawful jurisdiction.

The problem arises when § 609 is applied to substantively justified repossessions—repossessions that would have been authorized had the dealer complied with § 607. In those instances, the only right of which the Indian is deprived is the right not to have his vehicle repossessed until the dealer has complied with Rule § 607. Since the Indian has no substantive right to the vehicle, his loss under these circumstances is considerably less than if he had not in fact defaulted.

While the procedural right embodied in § 607 is worth something, the liquidated damages provision of § 609 overestimates its value. In most cases, application of § 609 to justified repossessions would operate as a windfall to the defaulting Indian. Although the ordinance is also useful to persuade car dealers that compliance with § 607 is the best policy, *Oliphant* does not permit the Court to recognize its deterrence value.

The Court is not saying that a defaulting Indian could never prove losses equal to § 609's liquidated damages. It is not difficult to imagine circumstances where, despite technical default, the equities would remain with the Indian.[10] The point is, in many cases involving substantively justified

repossession, § 609 would overcompensate. For this reason, the liquidated damages provision cannot be tolerated. It exceeds the Tribe's lawful authority.

## SUMMARY AND CONCLUSION

For years the courts have been struggling to define the boundaries of Indian sovereignty. Today, with the increased presence of non-Indians in Indian territory, the issue of tribal jurisdiction has become especially important.

It is without question that Indian sovereignty extends beyond the Tribe's ability to govern its own people. In order to assure the Tribe's political and economic integrity, and to protect the health, safety and welfare of its members, it is necessary for a tribe to exercise a degree of territorial jurisdiction.

In the past, the courts have affirmed the Tribes' power to tax non-members, *Washington v. Confederated Tribes of Colville, supra,* and to prescribe the conditions upon which non-members may enter the reservation. *United States v. Montana, supra.* Most significantly, under the appropriate circumstances, Indian sovereignty can preclude a non-Indian plaintiff from suing an Indian in any court but the Tribe's own. *Williams v. Lee, supra.*

This Court would extend the Tribes' territorial sovereignty to enable it to assert civil jurisdiction over non-Indian defendants. As previously stated, however, it would limit the Tribe's power to those cases which

(1) arise out of a consensual relationship with the Tribe or its members or threaten or have some direct effect on the political integrity, the economic security or the health or welfare of the Tribe, and

(2) are not inconsistent with an overriding national interest.

In keeping with the second requirement, this Court would hold that, in awarding civil judgments against non-Indians, the

---

**10.** For example, a dealer might tolerate late payment all along and then repossess as the contract nears completion.

Tribe cannot do more than reasonably compensate its plaintiff. Given the "unwarranted" intrusions that are possible with punishment, *see Oliphant v. Suquamish, supra,* the United States retains an "overriding national interest" in maintaining exclusive penal jurisdiction. If the Indians want to punish outsiders, either physically or financially, they can turn to the courts of the United States.

This Court concludes that the Navajo Tribe has the jurisdiction to enforce the minimum damage provision of § 609, but only as to repossessions that were not justified by the parties' contract and the law applicable thereto. As to repossessions that were substantively justified, the Indian must prove his damages. Damages in excess of that which reasonably compensates the plaintiff for his losses are not permissible. Both Babbitt and Gurley are entitled to a declaratory judgment and an injunction to this effect.

As to the individual cases presented in the Babbitt complaint, this Court is of the opinion that said cases should be retried in the Tribal Court of the Navajo Tribe in accordance with the principles announced herein.

Therefore,

IT IS ORDERED that plaintiffs submit a form of judgment, reflecting the foregoing opinion in compliance with Rule 54(b), Federal Rules of Civil Procedure.

IT IS FURTHER ORDERED that each party bear its own costs.